[Cite as *State v. Clipps*, 2019-Ohio-3569.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                      No. 107747

    v.                           :

BRIAN CLIPPS,                           :

    Defendant-Appellant.         :

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART, VACATED IN PART,
                AND REMANDED
**RELEASED AND JOURNALIZED:** September 5, 2019

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-18-626183-A and CR-18-626256-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Mary Court Weston, Assistant Prosecuting
Attorney, *for appellee.*

Mark A. Stanton, Cuyahoga County Public Defender, and
Noelle A. Powell, Assistant Public Defender, *for
appellant.*

FRANK D. CELEBREZZE, JR., J.:

{¶ 1} Defendant-appellant, Brian Clipps ("appellant"), brings the instant
appeal challenging his convictions and sentence for rape, felonious assault, and

aggravated robbery. Specifically, appellant argues that he was denied his constitutional right to a fair trial based on prejudicial preindictment delay, improper joinder, and prosecutorial misconduct; his convictions are against the manifest weight of the evidence; and that the trial court erred in finding him guilty on the sexually violent predator specification underlying the rape count in the 1998 indictment and imposing a 12-year prison sentence on the count. After a thorough review of the record and law, this court affirms in part, vacates in part, and remands the matter for further proceedings consistent with this opinion.

## I. Factual and Procedural History

{¶ 2} On February 26, 2018, the Cuyahoga County Grand Jury returned two indictments against appellant.

{¶ 3} First, in Cuyahoga C.P. No. CR-18-626256-A (hereinafter "1998 case" or "1998 indictment"), appellant was charged in a five-count indictment with two counts of rape, two counts of gross sexual imposition, and kidnapping. The rape and kidnapping counts contained sexually violent predator specifications, and the kidnapping count also contained a sexual motivation specification. This indictment pertained to offenses committed on December 18, 1998, against victim C.B.

{¶ 4} Second, in Cuyahoga C.P. No. CR-18-626183-A (hereinafter "2018 case" or "2018 indictment"), appellant was charged in a seven-count indictment with three counts of rape, felonious assault, aggravated robbery, and two counts of kidnapping. The rape counts, felonious assault count, and kidnapping offense charged in Count 6 contained sexually violent predator, notice of prior conviction,

and repeat violent offender specifications. The felonious assault count and kidnapping offense charged in Count 6 also contained sexual motivation specifications. The aggravated robbery count and the kidnapping offense charged in Count 7 contained notice of prior conviction and repeat violent predator specifications. This indictment pertained to offenses committed on February 17, 2018, against victim A.M.

{¶ 5} Appellant was arraigned in both cases on March 1, 2018. He pled not guilty to both indictments.

{¶ 6} On April 17, 2018, appellant filed a motion to dismiss the 1998 indictment based on preindictment delay. On June 27, 2018, the trial court denied appellant's motion to dismiss.

{¶ 7} On June 26, 2018, the state filed a motion to join the two criminal cases for trial. Appellant filed a brief in opposition to joinder on July 5, 2018. The trial court granted the state's motion to join the two cases on July 9, 2018.

{¶ 8} Appellant waived his right to a jury trial on the sexually violent predator specifications charged in the 1998 indictment, and the sexually violent predator, notice of prior conviction, and repeat violent offender specifications charged in the 2018 indictment. These specifications were tried to the bench. The remaining counts in both indictments and the sexual motivation specifications charged in the 2018 indictment were tried to a jury.

{¶ 9} Trial commenced in both criminal cases on July 9, 2018. At the close of the state's case-in-chief, the state dismissed the rape offense charged in Count 1

of the 1998 indictment. (Tr. 1553.) Defense counsel moved for a Crim.R. 29 judgment of acquittal, and the trial court granted defense counsel's motion on the gross sexual imposition offense charged in Count 3 of the 1998 indictment. (Tr. 1557.)

{¶ 10} On July 19, 2018, the jury returned the following verdict regarding the 1998 indictment: the jury found appellant guilty on the rape offense charged in Count 2; and the jury found appellant not guilty on the gross sexual imposition offense charged in Count 4 and the kidnapping offense and underlying sexual motivation specification charged in Count 5. The trial court found appellant guilty of the sexually violent predator specification underlying Count 2.

{¶ 11} The jury returned the following verdict regarding the 2018 indictment: the jury found appellant guilty on the rape offenses charged in Counts 2 and 3, the felonious assault offense charged in Count 4, the aggravated robbery offense charged in Count 5, and the kidnapping offense with the sexual motivation specification charged in Count 6. The trial court found appellant guilty of the specifications underlying Counts 2, 3, 4, 5, and 6.

{¶ 12} The trial court held a sentencing hearing on September 6, 2018. The trial court sentenced appellant to a prison term of 12 years to life on the rape conviction from the 1998 indictment. Finally, the trial court classified appellant as a sexual predator and reviewed his reporting requirements.

{¶ 13} The trial court determined that Counts 2, 3, and 6 in the 2018 indictment merged as allied offenses. The state elected to sentence appellant on

Count 3. The trial court imposed a prison sentence of 12 years to life: 12 years to life on the rape offense charged in Count 3; four years to life on the felonious assault offense charged in Count 4; and four years on the aggravated robbery offense charged in Count 5. The trial court ordered Counts 3, 4, and 5 to run concurrently with one another.

{¶ 14} The trial court ordered appellant's sentence of 12 years to life in the 1998 case to run consecutively to his sentence of 12 years to life in the 2018 case, for an aggregate prison sentence in both cases of 24 years to life.

{¶ 15} On October 2, 2018, appellant filed the instant appeal challenging his convictions and the trial court's sentence. He assigns seven errors for review:

> I. The Ohio Supreme Court's decision in *State v. Jones*, [148 Ohio St.3d 167,] 2016-Ohio-5105, [69 N.E.3d 688,] and this Court's recent decision in *State v. Willingham*, [8th Dist. Cuyahoga Nos. 106706 and 107033,] 2019-Ohio-1121, makes it clear that the trial court erred when it failed to dismiss the 1998 case involving C.B. for prejudicial pre-indictment delay in violation of [appellant's] right to a fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.
>
> II. The trial court denied [appellant] his fundamental right to a fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution when it joined two unrelated cases and thereby caused [appellant] undue prejudice.
>
> III. [Appellant's] conviction for a rape alleged to have occurred in 1998 is against the manifest weight of the evidence and, accordingly, [appellant] was denied his fundamental right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.
>
> IV. [Appellant's] convictions for a 2018 incident involving A.M. are against the manifest weight of the evidence and, accordingly, [appellant] was denied his fundamental right to a fair trial as

guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

V. [Appellant] was denied his fundamental right to a fair trial because of prosecutorial misconduct.

VI. [Appellant] cannot be found to be a sexually violent predator as alleged in the 1998 indictment.

VII. The trial court erred in sentencing [appellant] to 12 years for one count of rape from 1998 because the longest sentence available for a first degree felony in 1998 was 10 years.

## II. Law and Analysis

## A. Preindictment Delay

{¶ 16} In his first assignment of error, appellant argues that the trial court erred by denying his motion to dismiss the 1998 case based on prejudicial preindictment delay.

## 1. Standard of Review

In reviewing a trial court's decision on a motion to dismiss for preindictment delay, this court applies a de novo standard of review to the legal issues, but we afford great deference to the findings of fact made by the trial judge. *State v. Hunter*, [2017-Ohio-4180, 92 N.E.3d 137, ¶ 16 (8th Dist.)].

The statute of limitations for a criminal offense is the defendant's primary protection against overly stale criminal charges. *U.S. v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). However, the Due Process Clause of the Fifth Amendment provides additional protection in cases where the preindictment delay was unjustifiable and caused actual prejudice. *U.S. v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, [at] ¶ 12.

The Ohio Supreme Court has established a burden-shifting framework for analyzing a due-process claim based on preindictment delay. *Jones* at ¶ 13. Under this framework, the defendant bears the initial burden of presenting evidence of actual prejudice. *Id.* "Once a defendant

presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay." *Jones* at ¶ 13, citing *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998); *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 99. Therefore, if the defendant fails to establish actual prejudice, the court is not required to consider the reasons for the delay. *Adams* at ¶ 107.

"A court must 'consider the evidence as it exists when the indictment is filed and the prejudice the defendant will suffer at trial due to the delay.'" *Id.*, quoting *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 52. A claim of actual prejudice should be scrutinized "vis-à-vis the particular evidence that was lost or unavailable as a result of the delay" and "the relevance of the lost evidence and its purported effect on the defense." *Id.* at ¶ 23.

*State v. Walker*, 8th Dist. Cuyahoga No. 106414, 2018-Ohio-3669, ¶ 15-18.

### 2. Actual Prejudice

### a. Lost Evidence

{¶ 17} Regarding the first prong of the burden-shifting framework, appellant argues that he suffered actual prejudice as a result of the evidence that was lost between the 1998 incident and the 2018 trial. Specifically, regarding the purportedly lost evidence, appellant contends that (1) C.B.'s memory faded, and (2) the testimony of C.B.'s nephews,[1] who purportedly observed the 1998 incident, was lost.

---

[1] The record reflects that C.B. had three nephews that lived in the house with her and her sister. In December 1998, the youngest nephew was approximately two or three years old, and the oldest nephew was approximately seven years old. (Tr. 428.) During oral arguments, appellant appeared to focus only on the lost testimony of the oldest nephew. This nephew would have been approximately 27 years old at the time of trial.

{¶ 18} Appellant contends that he was prejudiced by this lost evidence because C.B. "remembered next to nothing about the 1998 incident."[2] Regarding C.B.'s nephews, appellant appears to argue that he was prejudiced by the delay in prosecution because the testimony of the seven-year-old nephew is "gone forever" as a result of the passage of time and the development of the nephew's brain. Appellant's brief at 8.

{¶ 19} As an initial matter, there is no indication in the record that the defense attempted to locate, contact, or subpoena the nephews in preparing a defense. In fact, appellant acknowledges that "[t]here is no information in the record about [the 27-year-old nephew's] availability[.]" Appellant's brief at 8. Appellant has not demonstrated that the nephews were unavailable or that their testimony regarding the 1998 incident has been lost. We cannot find that the nephews were unavailable or their testimony lost merely because the defense either failed to attempt to contact them or made a deliberate, tactical decision not to call the nephews at trial.

{¶ 20} Regarding appellant's claim of actual prejudice resulting from C.B.'s faded memory,

> [T]he possibility of faded memories, unavailable witnesses, and lost or destroyed evidence does not, in and of itself, constitute actual prejudice. [*State v.*] *Richardson*, [2016-Ohio-5843, 70 N.E.3d 1175, ¶ 11 (8th Dist.)]; *Jones*, [148 Ohio St.3d 167, 2016-Ohio-5105, 69 N.E.3d 688, at ¶ 21]. "Those are 'the real possibilit[ies] of prejudice inherent in any extended delay,' and statutes of limitations sufficiently protect against them." *Jones* at ¶ 21, quoting *Marion*[, 404 U.S. at 326,

---

[2] Appellant's brief at 8.

92 S.Ct. 455, 30 L.Ed.2d 468].  Rather, the defendant must establish what the missing evidence or unavailable witnesses might have offered in assisting in his defense.  *Richardson* at ¶ 13.

*State v. Smith*, 8th Dist. Cuyahoga No. 104203, 2016-Ohio-7893, ¶ 19.

{¶ 21} Appellant's arguments pertaining to the lost evidence or faded memory of C.B. and the nephews are based entirely on speculation.  Appellant speculates that had C.B. been able to recall more details about the encounter with him in 1998, these details would have been exculpatory or advantageous to the defense.  Similarly, appellant speculates that had the nephews been interviewed at the time of the incident or testified at trial, this testimony would also have been exculpatory or advantageous to the defense.  "While a defendant is not required to articulate specifically what the testimony of a missing witness would have been, he is required to provide an explanation of what exculpatory testimony the witness might have offered."  *Willingham*, 8th Dist. Cuyahoga Nos. 106706 and 107033, 2019-Ohio-1892, at ¶ 34, citing *Jones* at ¶ 28, and *Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, at ¶ 103.

{¶ 22} Appellant's speculation regarding the lost evidence is insufficient for satisfying his burden of demonstrating actual prejudice.  We cannot say that the lost or unavailable evidence identified by appellant would "minimize or eliminate the impact of the state's evidence and bolster the defense."  *Jones* at ¶ 28, citing *State v. Luck*, 15 Ohio St.3d 150, 157-158, 472 N.E.2d 1097 (1984); *see also State v. Hubbard*, 12th Dist. Butler No. CA92-03-058, 1992 Ohio App. LEXIS 5784, 4 (Nov. 16, 1992),

citing *U.S. v. Moran,* 759 F.2d 777 (9th Cir.1985) ("[p]roof of actual prejudice must be specific, particularized, and non-speculative.")

{¶ 23} Finally, we note that appellant did not defend against the 1998 case on the theory that the sexual encounter between him and C.B. was consensual. Rather, appellant offered a complete defense of actual innocence at trial, suggesting, for instance, that the bra on which his DNA profile was recovered did not belong to C.B.

{¶ 24} Based on the foregoing analysis, appellant failed to demonstrate actual prejudice resulting from the purportedly lost evidence or testimony of C.B. and her nephews.

### b. Change in Status

{¶ 25} Appellant further argues that he suffered actual prejudice because his 1999 conviction[3] hampered the tactics available to him to defend against the allegations. Specifically, appellant asserts that had the 1998 case been prosecuted at or around the time of the incident, before his 1999 conviction, he could have (1) resolved the 1998 case and the 1999 case globally (i.e. entering a guilty plea disposing both criminal cases under which he would receive concurrent sentences), and (2) testified on his own behalf.

{¶ 26} Appellant's global resolution argument is entirely speculative. Appellant speculates that (1) the state would have offered a global plea agreement

---

[3] Cuyahoga C.P. No. CR-99-376764.

resolving both criminal cases, (2) appellant would have accepted the global plea agreement, and (3) the trial court would have, in fact, ordered the sentences in the two cases to run concurrently with one another. This speculation does not satisfy appellant's burden of demonstrating actual prejudice.

{¶ 27} Regarding any prejudice resulting from his 1999 conviction, appellant was not precluded from testifying in his own defense based on the 1999 conviction. Although the conviction may impact the credibility of appellant's testimony, he could have still elected to testify regarding the 1998 and 2018 incidents. Either appellant or defense counsel made the tactical decision not to call appellant at trial. Finally, to the extent that appellant argues he was prejudiced by his 1999 conviction because he could no longer take the stand and testify on his own behalf, appellant brought any such prejudice upon himself through his own actions. We will not penalize the state for the consequences that appellant now faces as a result of the conduct for which he was convicted.

{¶ 28} Based on the foregoing analysis, we find that appellant failed to satisfy his burden of demonstrating actual prejudice resulting from the delay in prosecution. As a result, the burden did not shift to the state to demonstrate that the delay in prosecution was justified, and it was proper for the trial court to deny appellant's motion to dismiss on this basis alone.

### 3. Justifiable Delay

{¶ 29} Assuming, arguendo, that appellant established actual prejudice, the state produced evidence of a justifiable reason for delay in the commencement of

prosecution. A delay in the commencement of prosecution may be found unjustifiable when the state deliberately delays prosecution in order to gain a tactical advantage over the defendant, "or when the state, through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased." *Luck*, 15 Ohio St.3d at 158, 472 N.E.2d 1097 (1984).

{¶ 30} In the instant matter, appellant does not allege, nor does the record reflect that the state intentionally delayed prosecution in order to gain a tactical advantage over appellant. Furthermore, we cannot conclude that the state ceased its investigation in 1998 or 1999 and then moved forward with the prosecution in 2018 without new information.

{¶ 31} The record reflects that between 1998 and the indictment in February 2018, several DNA tests were conducted. The results of these DNA tests constituted new information and evidence regarding the encounter between appellant and C.B.

{¶ 32} C.B.'s rape-kit examination was conducted in 1998. The rape kit was tested for the first time in 2014. Although this initial test indicated that there was a DNA profile on the vaginal swabs, the DNA profile was incomplete, and as a result, could not be entered into CODIS.

{¶ 33} A second round of DNA testing was conducted in or around October 2017. During the second round of testing, C.B.'s clothing was submitted to BCI.

DNA analysis of C.B.'s bra revealed a DNA mixture that was consistent with C.B.'s DNA profile and a profile of an unknown male.

{¶ 34} A third round of DNA testing was conducted in January 2018. During the third round of testing, a sample of appellant's DNA was compared to the unknown DNA profile obtained from the bra. This test confirmed that the DNA mixture on the bra was consistent with both C.B.'s DNA and appellant's DNA.

{¶ 35} The first three rounds of DNA testing were conducted using "conventional DNA testing." (Tr. 1282.) A fourth round of DNA testing was conducted in April 2018. The fourth DNA test was conducted using "Y-STR DNA testing." (Tr. 1281.) This type of test "is a specialized DNA test where [analysts] look at only DNA on the Y chromosome. This makes it a male specific test and allows [analysts] to see if there is male DNA present when there is an abundance of female DNA that could be masking it." (Tr. 1281.) The fourth DNA test was conducted using "the new latest and greatest most advanced technology" that may not have been available at the time of the 1998 incident or the time the previous three DNA tests were conducted. The fourth DNA test confirmed that a male DNA profile, consistent with appellant's DNA, was present on the vaginal swabs.

{¶ 36} Finally, in addition to the four rounds of DNA testing, a photo array was also administered to C.B. in December 2017. C.B. identified appellant as the individual that attacked her in 1998.

{¶ 37} Aside from the new evidence based upon which the case was reopened and ultimately presented to the grand jury, the record reflects that the case was not

closed at the time of the 1998 incident due to negligence or error in judgment on behalf of the state. Appellant contends that "[l]aw enforcement simply ignored [the victim's] claims in 1998 and failed to follow any of the multiple leads they had to investigate her allegation. In the intervening 20 years, they gathered no new evidence regarding [the victim's] allegations, but in 2018, they finally brought [appellant] to trial." Appellant's brief at 9. Appellant's argument is entirely unsupported by the record.

{¶ 38} First, the record belies appellant's assertion that the police ignored C.B.'s allegation. A police report was generated, and a rape-kit examination was conducted. C.B. described her assailant as a black male, 5′9″, 135 pounds, with black hair and brown eyes. (Tr. 88.) She also informed investigators and medical personnel that her assailant's first name was Brian. She was unsure about her assailant's last name, but opined that his last name was "Cliffs" rather than "Clipps." (Tr. 847.) The investigating officers were unable to identify the assailant based on the information and partial name provided by C.B.

{¶ 39} Furthermore, when officers tried to follow up with C.B. during the course of their investigation, they were unable to contact her. Defense counsel acknowledged as much during opening statements at trial. *See* tr. 417 (defense counsel acknowledged that the case was closed due to a detective trying to contact the victim on a number of different occasions between December 1998 and June 1999 and that the police were unable to get in contact with her).

{¶ 40} There is no indication in the record that the case was closed because the investigating officers ignored C.B.'s allegation or determined that her allegation was unfounded. Rather, the case was closed because the investigators were not able to identify the assailant based on C.B.'s description, and they were unable to contact her to follow up with the investigation. The case was closed and marked "NFIL," no further investigative leads.

{¶ 41} Based on the foregoing analysis, the record contains a justifiable reason for the delay in the commencement of prosecution. Contrary to appellant's assertion, appellant was not brought to trial in 2018 based on the same evidence that was available in 1998 and 1999. Multiple DNA tests were conducted, and a photo array was administered during which C.B. identified appellant as her assailant.

{¶ 42} For all of the foregoing reasons, appellant's first assignment of error is overruled. The trial court did not err in denying appellant's motion to dismiss based on prejudicial preindictment delay.

## B. Joinder

{¶ 43} In his second assignment of error, appellant argues that the trial court erred and denied him his right to a fair trial by granting the state's motion to join the 1998 and 2018 cases for trial.

{¶ 44} Pursuant to Crim.R. 8(A), governing joinder of offenses, two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal

conduct." If the requirements of Crim.R. 8(A) are satisfied, the law favors joining multiple offenses in a single trial. *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990); *State v. Ferrell*, 8th Dist. Cuyahoga No. 100659, 2014-Ohio-4377, ¶ 38. The trial court may deny a motion for joinder or sever two cases, however, if it appears that the defendant would be prejudiced by the joinder of the two cases in a single trial. Crim.R. 14; *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 95. The defendant bears the burden of proving prejudice and that the trial court abused its discretion in joining the two cases. *Diar* at *id*.

{¶ 45} If a defendant contends that he or she is prejudiced by joinder of multiple offenses, the state can refute a defendant's claim of prejudice in two ways: (1) a showing that the evidence of each crime is simple and direct, known as the "joinder test," or (2) a showing that the evidence of the other crimes would be admissible even if the counts were severed, known as the "other acts" test. *State v. Anderson*, 2017-Ohio-931, 86 N.E.3d 870, ¶ 25 (8th Dist.), citing *Lott* at 163. If the evidence is "simple and direct," the defendant is not prejudiced by joinder regardless of the nonadmissibility of evidence of the crimes as other acts under Evid.R. 404(B). *Lott* at *id*. Accordingly, if the state can meet the requirements of the "joinder test," it need not meet the requirements of the "other acts" test, which involves a stricter standard. *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 66, citing *State v. Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991).

> "Simple and direct" evidence means that the evidence of each crime is "so clearly separate and distinct as to prevent the jury from considering evidence of [some crimes] as corroborative of the other." *State v. Belle*,

8th Dist. Cuyahoga Nos. 107046 and 107300, 2019-Ohio-787, ¶ 25, citing *State v. Quinones*, 11th Dist. Lake No. 2003-L-015, 2005-Ohio-6576, ¶ 48. Evidence is "simple and direct" if the trier of fact is capable of segregating the proof required for each offense. *Belle* at *id.*, citing *State v. Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379, 937 N.E.2d 136, ¶ 39 (10th Dist.).

The object of the "simple and direct" test is to prevent the jury from improperly considering evidence of various crimes as corroborative of each other. *State v. Echols*, 128 Ohio App.3d 677, 694, 716 N.E.2d 728 (1st Dist.1998). "The very essence of the rule is that the evidence be such that the jury is unlikely to be confused by it or misuse it." *Id.* Thus, as this court has stated, "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof." *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 16, citing *State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224 and L-09-1225, 2010-Ohio-4202, ¶ 33.

*State v. Knox*, 8th Dist. Cuyahoga No. 107414, 2019-Ohio-1246, ¶ 48-49.

{¶ 46} In the instant matter, appellant argues that he was prejudiced by joinder of the two cases because the state "jumbled all the evidence together" and "asked the jury to conflate the two sets of allegations against [him]." Appellant's brief at 11, 21. The latter assertion will be addressed in the analysis of appellant's fifth assignment of error. After reviewing the record, we find no merit to the former assertion.

{¶ 47} Assuming, arguendo, that appellant was able to demonstrate prejudice as a result of the joinder of the two cases, any prejudice was negated by the simple and direct nature of the evidence in both cases. As a result of the simple and direct nature of the evidence pertaining to the 1998 and 2018 cases, it was unlikely that the jury would have confused the evidence proving the separate offenses. *See State v. Johnson*, 88 Ohio St.3d 95, 110, 723 N.E.2d 1054 (2000); *State*

*v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992) (evidence of each offense was so simple and distinct that the jury could clearly segregate the evidence).

{¶ 48} Although the rape offenses involving C.B. and A.M. are similar crimes, they are entirely distinct in proof. The evidence used to establish the elements of each offense was simple and direct — each rape kit was analyzed separately and none of the evidence overlapped between the two victims.

{¶ 49} The record reflects that the state primarily presented the evidence regarding the offenses against each victim separately, in sequential order, and without overlap of proof. The state called 22 witnesses at trial. The first eight witnesses testified about the 1998 incident. Twelve of the remaining 14 witnesses then testified about the 2018 incident. "'Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof.'" *Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, at ¶ 16, quoting *Lewis*, 6th Dist. Lucas Nos. L-09-1224 and L-09-1225, 2010-Ohio-4202, at ¶ 33.

{¶ 50} Only two of the 22 witnesses called by the state, Gene Kulp and Hallie Dreyer, testified out of sequential order — testifying about the 1998 incident after evidence pertaining to the 2018 incident had been presented to the jury. Kulp testified about the chain of custody of evidence that had been collected in the 1998 case. Before Kulp testified, the state clarified that his testimony pertained to the 1998 case rather than the 2018 case:

THE COURT: Are we still on the February 2018 case? We're back to the other one, 12/18/98?

[PROSECUTOR]: Correct.

(Tr. 960.)

{¶ 51} Dreyer testified about DNA testing that had been conducted in the 1998 case. Before Dreyer testified, the trial court advised the jury that her testimony pertained to the 1998 case: "We're going back to the '98 case, guys." (Tr. 1277.) Based on the nature of Kulp's and Dreyer's testimony, and the clarification that the testimony pertained to the 1998 incident rather than the 2018 incident, we do not find that appellant was prejudiced by the presentation of the testimony out of order.

{¶ 52} The state emphasized during its final closing argument that "[o]ne thing this case was about is two separate unrelated instances[.]" (Tr. 1658.) Finally the state advised the jury, "[t]hese two cases are separate and should be considered separate by you. They are not related at all. Police didn't have any idea, police had no idea of the — I shouldn't cross the separate investigations. [Victim A.M.] should be considered by you separately." (Tr. 1675.)

{¶ 53} In addition to the state's advisements, the trial court instructed the jury, before opening statements and the state's case-in-chief, that "you will deliberate separately on each count of each case separate from each count in each case." (Tr. 144.) The trial court elaborated on this instruction following the presentation of evidence, providing the following instruction to the jury:

Let's go just talk about the separate cases and counts. I did tell you that there will be an instruction about deliberating on them so I am going to read that to you now. The gist of it is, you consider each count and each

case separately uninfluenced by your verdict as to the other counts or cases.  Okay?

\* \* \*

You are to consider the counts separately.  The charges set forth in each count of the indictments constitute separate and distinct matter.  You must consider each count and the evidence applicable to each count separately and you must state your findings as to each count uninfluenced by verdict as to any other count.

(Tr. 1617-1618.)  The trial court reiterated this instruction in reviewing the verdict forms with the jury.  (Tr. 1688.)

{¶ 54} The Ohio Supreme Court has held that a jury is presumed to have followed the trial court's instructions.  *See State v. Jones*, 91 Ohio St.3d 335, 344, 744 N.E.2d 1163 (2001); *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001).  It is the defendant's obligation to overcome this presumption.  *State v. Gibson*, 8th Dist. Cuyahoga No. 103958, 2016-Ohio-7778, ¶ 17, citing *Greer v. Miller*, 483 U.S. 756, 766, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987), fn. 8.

{¶ 55} In this case, appellant has failed to demonstrate that the jury disregarded the trial court's instructions and the state's advisements to consider the 1998 case and 2018 case separately.  In fact, the record reflects that the jury was able to consider the evidence related to each case and each count separately.  As noted above, the jury acquitted appellant on Counts 4 and 5 in the 1998 case, and Counts 1 and 7 in the 2018 case.  As such, we cannot find that the jury confused the evidence as to the various counts or was improperly influenced by any possible cumulative effect of joinder.  *See State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 95 (8th Dist.) (defendant was unable to show that he was prejudiced by the trial court's

denial of motion to sever where he was acquitted of one charge and convicted of other offenses); citing *State v. Banks*, 2015-Ohio-5413, 56 N.E.3d 289, ¶ 66-68 (8th Dist.) (defendant was unable to show that he was prejudiced by the trial court's denial of motion to sever where he was acquitted of some charges and convicted of a lesser offense in others).

{¶ 56} Based on the foregoing analysis, we find no basis upon which to conclude that the trial court's judgment granting the state's motion for joinder was unreasonable, arbitrary, or unconscionable, or that the trial court's ruling deprived appellant of a fair trial. The simple and direct nature of the cases against appellant offset any prejudice that might have resulted in trying both cases together. Appellant's second assignment of error is overruled.

### C. Manifest Weight

{¶ 57} In his third and fourth assignments of error, appellant argues that his convictions are against the manifest weight of the evidence.

### 1. Standard of Review

{¶ 58} A manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. A reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*,

20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A conviction should be reversed as against the manifest weight of the evidence only in the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 59} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The jury may take note of any inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

## 2. 1998 Rape

{¶ 60} In his third assignment of error, appellant argues that his rape conviction on Count 2 in the 1998 case is against the manifest weight of the evidence. In support of his manifest weight challenge, appellant argues that C.B.'s testimony is "almost completely lacking in critical details to establish rape by force or threat of

force," and that her trial testimony was inconsistent with the statements she provided at the time of the incident. Appellant's brief at 16.

{¶ 61} As an initial matter, C.B. acknowledged at trial that she "doesn't remember a whole lot" about the December 18, 1998 incident. She explained that it bothers her "very much" that she does not remember more details about the incident. (Tr. 436.) C.B. confirmed that she had a better memory of the night in question at the time of the incident than she did at the time of trial. (Tr. 447.)

{¶ 62} C.B. testified at trial that she met appellant through a telephone chat line or internet chat room. She knew his first name but never knew his last name. (Tr. 430.) They eventually met in person on December 18, 1998. On that evening, appellant came to her sister's house on Connecticut Avenue.[4]

{¶ 63} C.B.'s sister was at work and she was watching her nephews.[5] She and appellant took the nephews downtown to see the Christmas lights at Public Square. Afterwards, they returned to the house and she put the boys to bed upstairs. C.B. testified that she wanted appellant to leave at that point because she was "uncomfortable." (Tr. 432.) She explained that nothing specific had happened based upon which she was uncomfortable, it was just a feeling. She testified that she asked appellant to leave when they returned to the house from Public Square. Appellant did not leave when she asked.

---

[4] C.B. and J.C. are stepsisters.
[5] In December 1998, she opined that her nephews were approximately two or three years old, and six years old. (Tr. 428.)

{¶ 64} C.B. provided the following account of the events that transpired after they returned to the house: "I don't think I really remember a whole lot after [putting the nephews to bed and wanting appellant to leave]. I just remember like [appellant] forcing himself on me. And I remember — the only thing I remember during that was my three nephews coming down the stairs crying." (Tr. 433.)

{¶ 65} She recalled that when her nephews came downstairs, she "was wishing it would be over." She clarified that she was wishing that appellant would stop forcing himself on her. (Tr. 439.) At the time her nephews came downstairs, she was on the floor of the living room, her pants and underpants were off, and appellant was forcing himself on her. (Tr. 441.) She was on her knees and appellant was behind her. Regarding her assertion that appellant "forced himself on her," she specified that appellant "ha[d] sex with me" and "[h]is penis touched my vagina."

{¶ 66} The next thing she remembered after appellant forced himself on her was calling her sister at work and her sister returning to the house. C.B. contacted her sister at work and asked her to come home. She told her sister what happened and that appellant forced himself on her. Her sister returned home from work and drove C.B. to the hospital. She testified that she told the hospital personnel what happened to her and that she was honest when she spoke with them. She recalled not wanting to submit to a rape-kit examination because she was scared. (Tr. 462.)

{¶ 67} C.B. testified that approximately one year before trial, she was contacted by an investigator. On December 11, 2017, she met with Investigator Gerald Crayton and a photo array was presented to her. She identified appellant

from the photo array and identified him as the individual that assaulted her in December 1998. (Tr. 453.) C.B. confirmed that she did not have consensual sex or sexual conduct with any of the individuals in the photo array, including appellant.

{¶ 68} After reviewing the record, we find no basis upon which to conclude that appellant's rape conviction pertaining to C.B. is against the manifest weight of the evidence. C.B.'s testimony is corroborated by the DNA evidence linking appellant's DNA to C.B.'s rape kit.

{¶ 69} Appellant argues that the SANE nurse's notes indicating that C.B. and her sister were laughing and joking contradicted C.B.'s assertion that she had been attacked. We disagree and find that C.B.'s medical records from 1998 support her trial testimony.

{¶ 70} John Zubil, a retired Marymount Hospital doctor who treated C.B. in 1998 testified at trial. He read the history that he took from C.B. after the incident:

> This is an 18-year-old white female who was allegedly sexually assaulted at her home at 12:30 a.m. this morning. This occurred in her living room by an individual she had known for about two months. He did not threaten her and did not physically abuse her. She states it was only vaginal sex and denies oral and reckless sex, and she does not think he ejaculated. She had consensual sex at least five days prior.

(Tr. 700-701.)

{¶ 71} Zubil also read notes that had been recorded by a nurse that treated C.B.:

> Patient states, friend, put in quotes, friend at home after returning from Tower City. * * * States, * * * [b]egan touching her breasts over and then under the shirt. States, she told him to stop. Sitting on something. Passed on back. Pulled pants down and touching genitals. States, told

to stop. Penetrated vaginally. States, doesn't think ejaculated. States, I said stop. States, he said stop teasing me. Got up and left. * * * Called 911 at 2:30 and states, Cleveland police from 34th precinct came to the house and took report. * * * States, took report at home of the patient. * * * Cleveland Fourth District contacted to pick up rape kit. Sister was present during the exam. Laughing and joking with the sister during the exam.

(Tr. 703.) Zubil's history and the nurse's notes are consistent with C.B.'s trial testimony that appellant raped her.

{¶ 72} C.B.'s testimony is also consistent with the testimony of her sister, J.C. J.C. testified at trial that C.B. contacted her via pager while she was at work on the evening of December 18, 1998. J.C. explained that C.B. paged her more than once: "[C.B.] had blown up my pager. It was like going off and going off." (Tr. 477.) J.C. knew something was wrong because C.B. paged her more than normal. J.C. spoke with C.B. on the phone. She explained that C.B. "was talking really fast and really soft like almost whispering." (Tr. 476.) "[C.B.] was like upset, shaky kind of. Like she wanted me to hurry up and come home." (Tr. 478.) Based on what C.B. told her over the phone, J.C. urged her to call the police. C.B. was initially hesitant and afraid to report the assault to the police, but she eventually decided to do so. After speaking with C.B., J.C. completed the one or two hours remaining in her shift and returned home.

{¶ 73} When she arrived home, police were at the Connecticut Avenue house. J.C. testified that C.B. "was shaking," "just like shaking and talking really quickly but really softly." (Tr. 480-481.) J.C. had not heard C.B. speak like this before, and the

way that C.B. was speaking led her to believe that "[s]omething had happened." (Tr. 482.) J.C. took C.B. to Marymount Hospital and stayed with her at the hospital.

{¶ 74} Finally, appellant appears to argue, based on the nurse's notes that appellant told the victim to "stop teasing me," that the encounter may have initially been consensual before the victim revoked the consent. *See* appellant's brief at 16. To the extent that appellant suggests that C.B. initially consented to sexual conduct and then revoked consent, this argument is entirely contradicted by C.B.'s trial testimony. Furthermore, the defense's theory of the case at trial was not that C.B. initially consented to the sexual conduct but then revoked consent. When Investigator Crayton interviewed appellant in 2018, appellant denied knowing C.B., denied her accusations documented in the police report, and asserted that he was in Brunswick, not Cleveland, at the time. Furthermore, during closing arguments, defense counsel suggested that the bra on which appellant's DNA was recovered did not belong to C.B. (Tr. 1647-1648.) Appellant cannot raise the issue of revoked consent for the first time on appeal.

{¶ 75} For all of the foregoing reasons, we cannot say that this is the exceptional case in which the jury clearly lost its way in convicting appellant or that the evidence weighs heavily against appellant's conviction. Accordingly, appellant's third assignment of error is overruled.

### 3. 2018 Convictions

{¶ 76} In his fourth assignment of error, appellant argues that his convictions for rape, felonious assault, aggravated robbery, and kidnapping in the 2018 case were against the manifest weight of the evidence.

{¶ 77} A.M. testified at trial that on February 17, 2018, she got into appellant's car and the two of them drove to the area of Clark Avenue and West 73rd Street. She agreed to perform oral sex on appellant in exchange for $20. She explained that everything was fine at first, just as it was during the encounter two weeks prior,[6] but at some point, appellant wanted vaginal sex. A.M. provided the following account of the incident:

> He wanted to have sex. And then when I was giving him head, he started, he grabbed me by my neck and was, his arm was like this. He was choking me, and he was choking me really bad. And I remember not being able to breathe. I remember like slowly passing out, like I was struggling really bad for air, and I remember like starting to go unconscious. I couldn't breathe. It was hard to stay awake. I guess at one point I passed out.
>
> Then one time I woke up and I remember like my legs were like by the driver's side and my middle body was in like, not, I don't think there's a center console but in that area, and my head was down on the passenger side and he was on top of me and he was inside of me. And then I remember — I don't remember anything after that up until the point I woke up and he was finishing having sex with me, and when he finished having sex, that's when I noticed he still had the condom on before I had — that I put on when I was going to give him oral sex when everything was okay.
>
> And then when I was trying to leave, I got up and was trying to leave. He started choking me again. With his fingers he was like stabbing at my eyeballs and like gauging my eyeballs when I was trying to get away. We were going back and forth fighting. At one point in time, I'm not 100 percent sure, but I pulled his keys out of the ignition so he couldn't

---

[6] Two weeks before the February 17, 2018 incident, the victim performed oral sex on appellant in exchange for $40.

take off, and I threw them out of the car. I think. Everything is like, a lot of it is blurry, especially with me being, not being able to remember a lot of it, but we were fighting and going back and forth, and then at one point he had grabbed me by my shirt. I was wearing a white pink like hooded sweatshirt, and I was trying to get away and he grabbed that. So I kind of — you know when someone grabs your shirt, you can slip out of it? I slipped out of it and was like that's how I got away.

And, oh, I kept telling him, I'm calling the police, I'm calling the police, I'm calling the police. So when I got away, I was like briefly went to the back of the car and like recited his license plate out loud over and over and over until I was gone. And the whole way like the very next street my friend lives on, I was like still reciting it over and over and over. And this guy had picked me up in his car, and he asked me what was going on. That's when I used his phone to call my boyfriend. And he gave me a T-shirt so I wasn't exposed or whatever.

(Tr. 1178-1180.)

{¶ 78} When she was performing oral sex, appellant grabbed her and started choking her. She tried to get away from him, but it became difficult for her to breathe. She eventually lost consciousness. The next thing she remembers after regaining consciousness was waking up with appellant on top of her having sex. Appellant forced his penis into her vagina. She did not consent to vaginal sex.

{¶ 79} A.M. was able to get out of the vehicle. She was behind the vehicle, viewed the license plate, and began reciting it to herself. At this point, she began to run. As she was running, she encountered a male driving on Clark Avenue, Mark Lewis. Lewis offered A.M. a ride and gave her his cell phone.

{¶ 80} A photo array was administered to A.M. on February 18, 2018. A.M. identified appellant as the male that attacked her. She told the officer that administered the photo array that she was 70 percent sure appellant was the individual that attacked her. At trial, she explained that she was only 70 percent

sure during the photo array because she had "only seen the guy for a short period of time[.]" (Tr. 1273-1274.) She identified appellant at trial as the person that attacked her with 100 percent certainty. (Tr. 1265.)

{¶ 81} On the same day, February 17, 2018, appellant called the Cleveland Police Department's non-emergency line at approximately 9:25 a.m. and alleged that he had just been robbed at knifepoint. Cleveland Police Officer Brenda Korber testified at trial that she responded to appellant's apartment at 7934 Lorain Avenue and spoke with appellant about the purported robbery. According to Officer Korber,

> [appellant] handed me a driver's license and said that he was outside taking out the garbage in the rear of his apartment building and a female had approached him and asked him to come help her find something. He followed her down an alley, which is Colgate Court, and they went into another yard and she pulled out a knife on him and said, give me what you got, and he slapped the knife out of her hand and attempted to grab her and hold her for police, at which time they struggled and the female — essentially he had her clothes, and she backed out of her clothes and left her bra and all her outer wear and ran down the alley with only pants on and naked from the waist up.

(Tr. 866-867.) Appellant alleged that the robbery occurred around 9:15 a.m. The driver's license that appellant provided to the responding officers was A.M.'s license.

{¶ 82} Officers attempted to locate A.M. at her grandmother's house. A.M. returned to her grandmother's house approximately 30 minutes after appellant reported the robbery. Before officers spoke with her about appellant's allegations, A.M. advised them that she had just been raped.

{¶ 83} In the instant matter, we initially emphasize that in his fourth assignment of error, appellant is challenging his 2018 convictions on manifest

weight grounds. In his appellate brief, however, appellant argues, "a criminal case is not a competition for the most compelling story. The defendant does not have to tell a story at all. A conviction must be based on the [s]tate presenting evidence that proves guilt beyond a reasonable doubt." Appellant's brief at 19.

{¶ 84} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541, at paragraph two of the syllabus. "Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief." *Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, at ¶ 25, citing *Thompkins* at 386-387.

{¶ 85} To the extent that appellant is attempting to also challenge his 2018 convictions on the basis that they were not supported by sufficient evidence, appellant does not specifically present an argument as to why there was insufficient evidence to support his convictions, and he has failed to raise a separate assignment of error challenging the sufficiency of the evidence, as required by App.R. 16(A)(7). Accordingly, we disregard and overrule appellant's fourth assignment of error to the extent that it relates to the sufficiency of the evidence. *See Cleveland v. Hall*, 8th Dist. Cuyahoga No. 101820, 2015-Ohio-2698, ¶ 14, citing App.R. 16(A)(7) (pursuant to App.R. 16(A)(7), this court overruled an appellant's assignment of error relating to a sufficiency challenge because the appellant did not make a specific argument regarding why the convictions were not supported by sufficient evidence and only

addressed the issues relating to the manifest weight challenge). We will, however, address the issues and arguments appellant raises in his fourth assignment of error that pertain to the manifest weight of the evidence.

{¶ 86} In support of his manifest weight challenge, appellant argues that the physical evidence supports his theory of the case — that he was the victim of a robbery — rather than A.M.'s version of the incident and the state's theory — that appellant raped her. Specifically, appellant emphasizes that A.M.'s DNA was not recovered in his car, and based on the physical struggle described by A.M., it would be impossible for A.M.'s DNA to not be in the car. Appellant further argues that his DNA was not matched to A.M.'s rape kit. Appellant contends that A.M.'s version of the incident is "squarely rebutted by the lack of physical evidence[.]" Appellant's brief at 19.

{¶ 87} DNA analyst Marissa Esterline testified that "[t]he amount of DNA present and whether it's detectable or not could be impacted by multiple factors. In the case of a sexual assault, if someone is wearing a condom, seminal material will not [be] deposited in a cavity. It depends how much interaction and touching occurred between individuals depending on how much transfer happened." (Tr. 1341-1342.) Esterline went on to explain that an amount of DNA that is transferred from one person to another or from one person to an object could be washed away before the DNA is detected by a test.

{¶ 88} In this case, A.M. testified that appellant was wearing a condom during the oral and vaginal sex. As such, we cannot say that appellant's convictions

are against the manifest weight of the evidence based on the fact that his DNA was not matched to A.M.'s rape kit.

{¶ 89} Furthermore, police did not immediately come into contact with appellant or his vehicle. Appellant called the police at approximately 9:25 a.m., and alleged that the robbery occurred around 9:15 a.m. (Tr. 866-867.) The rape occurred between 8:53 a.m. and 9:06 a.m. (Tr. 1499.) Appellant was not immediately apprehended at the scene of the rape nor was his vehicle seized at that time. Accordingly, although the victim's DNA was not detected inside the vehicle, the jury was able to consider that officers did not come into contact with appellant until he called to report a robbery. When he reported the robbery, he made no mention of his vehicle being involved. A.M.'s DNA could have been removed or washed away from appellant's vehicle — either deliberately or inadvertently — between the time that A.M. jumped out of the vehicle and appellant called the police to report a robbery. As such, we cannot say that appellant's convictions are against the manifest weight of the evidence based on the fact that A.M.'s DNA was not detected inside appellant's vehicle.

{¶ 90} Although A.M.'s DNA was not detected in appellant's vehicle and appellant's DNA was not matched to A.M.'s rape kit, A.M.'s statements at the time of the incident and her trial testimony were consistent with and corroborated by other direct and circumstantial evidence presented at trial. The license plate number that A.M. observed and memorized after she got out of appellant's car and repeated to Lewis was matched to appellant's vehicle. (Tr. 999.)

{¶ 91} As noted above, A.M. testified that appellant choked her and "stabbed" her eyes. The testimony of Mark Lewis, Garrett Anderson, Cleveland Police Officer Theresa Cavett, Cleveland Police Detective Richard Tusing, and SANE Nurse Shelley Uhlir regarding A.M.'s injuries and her demeanor following the encounter with appellant was consistent with her trial testimony.

{¶ 92} Lewis testified that when he encountered A.M., she was half-naked and crying. Lewis explained that A.M. appeared to be "distressed, afraid, crying, hurt." (Tr. 904.) He described A.M. as "beyond upset," and "[f]urious, crying, tears, angry, like literally like beyond upset." (Tr. 897.) Lewis explained that A.M. had blood coming down her face. A.M. told him that she had just been raped.

{¶ 93} A.M.'s boyfriend, Garrett Anderson, testified that he got a call from an unknown number. He answered the phone and it was A.M. calling from Lewis's cell phone. A.M. was crying and asserted that she had just been raped. According to Anderson, A.M. sounded "[h]ysterical," and he explained that she "was out of breath, breathing hard. She was crying[.]" (Tr. 1389-1390.) He asked her what was wrong and she told him that "some dude raped her." (Tr. 1390.)

{¶ 94} Officer Cavett testified that she spoke to A.M. at her grandmother's house. A.M. was crying and appeared to have suffered an eye injury. Officer Cavett also stated that A.M. had red marks all over her neck. Officer Cavett testified that A.M. had a black right eye and scrapes on her neck. Officer Cavett explained that "[i]t looked like she was choked. I've seen it in 12 years. She had marks, fingernails, red marks all over her throat and upper chest area." (Tr. 1000.)

{¶ 95} Detective Tusing testified that he spoke with A.M. the day after the incident. He explained that A.M.'s right eye was bloody and distorted. (Tr. 1455.)

{¶ 96} Nurse Uhlir testified that she observed scratches by A.M.'s eye and on her back. She had abrasions below her right eye and an abrasion on her cornea. (Tr. 1093.)

{¶ 97} The testimony of Lewis, Anderson, Officer Cavett, Detective Tusing, and Uhlir is consistent with A.M.'s version of the events, that she had been raped, and contradicts appellant's theory of the case that A.M. had attempted to rob him behind his apartment.

{¶ 98} A.M.'s testimony that appellant raped her in his vehicle in the area of Clark Avenue and West 73rd Street is consistent with and supported by the testimony of Lewis. A.M. testified that she encountered Lewis when she was running on Clark Avenue. Lewis testified that he encountered A.M. when he was driving on West 73rd Street and took a right-hand turn onto Clark Avenue. (Tr. 894.)

{¶ 99} Appellant's theory of the case, that he had been robbed behind his apartment building in the area of Lorain Avenue and Colgate Court, was contradicted by the testimony of Lewis, Detective Tusing, Officer Korber, and Officer Cavett. Detective Tusing testified that he reviewed surveillance footage from cameras behind appellant's apartment building and on Colgate Court where the robbery purportedly occurred and he did not see a robbery occur. (Tr. 1468-1469.)

{¶ 100} Appellant told Officer Korber that the female that robbed him did not pick up the knife after he slapped it out of her hands. Officer Korber testified that officers spent 10 to 15 minutes searching for the knife and they were not able to find it. Officer Cavett also testified that they spent ten minutes looking for the knife but were unable to find it.

{¶ 101} Appellant appears to argue that A.M.'s testimony was not credible or believable, and that her criminal history and history of prostitution and substance abuse casts doubt on the veracity of her testimony. We disagree. As noted above, A.M.'s testimony was consistent with and corroborated by other evidence presented at trial. Furthermore, the jury was in the best position to assess the credibility of A.M. and her proffered testimony.

{¶ 102} A.M. testified in detail about her criminal record, her history of substance abuse, and the means by which she would earn money to support her drug addiction. Accordingly, the jury had sufficient information to assess the credibility of all of the witnesses, including A.M.

{¶ 103} Finally, appellant emphasizes that when A.M.'s boyfriend picked her up after the encounter, A.M. went home and did not go to the hospital or report the incident to police. Appellant maintains that A.M. only came into contact with the police because appellant reported the robbery and gave police her ID.

{¶ 104} To the extent that appellant suggests that A.M. only came forward with the rape allegation after she had been confronted by the police and accused of robbery, this argument is contradicted by Officer Cavett's testimony. When A.M.

told Officer Cavett that she had been raped, A.M. had not been confronted with nor made aware of the robbery allegation that appellant reported to the police.

{¶ 105} For all of the foregoing reasons, we find no basis upon which to conclude that appellant's convictions in the 2018 case are against the manifest weight of the evidence. As noted above, A.M. testified that appellant raped her in his vehicle. On the other hand, the defense's theory of the case was that A.M. robbed appellant behind his apartment building. "'[A] conviction is not against the manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the testimony presented by the state.'" *State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, ¶ 71, quoting *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 28. This is not the exceptional case in which the jury clearly lost its way or that the evidence weighs heavily against appellant's convictions. Accordingly, appellant's fourth assignment of error is overruled.

### D. Prosecutorial Misconduct

{¶ 106} In his fifth assignment of error, appellant argues that the state engaged in prosecutorial misconduct during trial and that the misconduct deprived him of his right to a fair trial.

### 1. Standard of Review

{¶ 107} The test for prosecutorial misconduct is whether the prosecutor's remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. *State v. Smith*, 87 Ohio St.3d 424, 442, 721 N.E.2d 93 (2000), citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone

of analysis "is the fairness of the trial, not the culpability of the prosecutor." *Id.*, citing *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). An appellant is only entitled to a new trial when (1) a prosecutor asks improper questions or makes improper remarks and (2) those questions or remarks substantially prejudiced appellant. *State v. Pate*, 8th Dist. Cuyahoga No. 95382, 2011-Ohio-1692, ¶ 19, citing *Smith*, 14 Ohio St.3d 13, 470 N.E.2d 883.

### 2. Reference to Criminal Record

{¶ 108} First, appellant argues that the state committed prosecutorial misconduct by referencing appellant's criminal record, which had been barred by the court's pretrial ruling on the state's notice of intent to introduce Evid.R. 404(B) other acts evidence, during redirect examination of appellant's girlfriend, Reyna Schlegel.

{¶ 109} During cross-examination of appellant's girlfriend, defense counsel asked Schlegel what appellant told her about the incident that transpired when he took the garbage out. She testified that appellant "was just telling me he was trying to take the garbage out and he heard a female voice say, I need some help or whatever. I don't even remember exactly what he said. He said he approached her. She pulled out a knife and then it just went to crap basically." (Tr. 1442.) The following exchange took place on redirect examination:

> [STATE]: You were just asked to talk about what [appellant] told you, correct?
>
> [SCHLEGEL]: Uh-huh.
>
> * * *

[STATE]: All right. Let me [ask] you this: You were asked questions about [appellant's] own statements, correct?

[SCHLEGEL]: Uh-huh.

[STATE]: And would it affect whether you believed him or not if you knew about his criminal record?

[DEFENSE COUNSEL]: Objection.

THE COURT: That's sustained. The jury is ordered to not even consider that question. It's not evidence and the question is stricken.

(Tr. 1443-1444.)

{¶ 110} In this appeal, the state argues that it was attempting to impeach appellant because he was essentially permitted to testify, through his girlfriend, without taking the stand.

{¶ 111} Assuming, arguendo, that the state's question was improper, after reviewing the record, we find no basis upon which to conclude that appellant was prejudiced by the question or that the question denied appellant a fair trial. The Ohio Supreme Court has held that prosecutorial misconduct does not exist where improper questions were properly objected to, the objections were sustained, and the prosecutor did not "embark on or embrace a pattern of repeated or egregious abuse of examination or cross-examination." *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987).

{¶ 112} In this case, defense counsel objected to the question about appellant's criminal record. The trial court sustained the objection, ordered the jury to disregard the question, asserted that the question was not evidence, and ordered the question to be stricken. This court presumes that the jury heeded the trial court's

instructions. *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 157.

{¶ 113} The state did not ask Schlegel any additional questions following the trial court's ruling. Nor does the record reflect that the state embarked on or embraced an abusive pattern of examining other witnesses at trial.

{¶ 114} Based on the foregoing analysis, appellant's fifth assignment of error is overruled with respect to the question about his criminal record.

### 3. Closing Argument

{¶ 115} Second, appellant argues that the state committed prosecutorial misconduct during its final closing argument by asserting that "the evidence corroborates itself[.]" (Tr. 1678.) Appellant claims that this was the state's attempt to "conflate the two sets of allegations against [him]." Appellant's brief at 21.

{¶ 116} Closing arguments must be viewed in their entirety to determine whether the purportedly improper remarks were prejudicial. *State v. Mann*, 93 Ohio App.3d 301, 312, 638 N.E.2d 585 (8th Dist.1993).

> A prosecutor has a duty in closing argument to avoid efforts to obtain a conviction by going beyond the evidence before the jury. *Smith*[, 14 Ohio St.3d at 14, 470 N.E.2d 883]. "Prosecutors must avoid insinuations and assertions calculated to mislead. They may not express their personal beliefs or opinions regarding the guilt of the accused, and they may not allude to matters not supported by admissible evidence." *Lott*, 51 Ohio St.3d [at] 166, 555 N.E.2d 293. However, "'[i]n the tension and turmoil of a trial, both the prosecution and the defense have wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn therefrom.'" *Id.* at 165, quoting *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970). *See also State v. Ballew*, 76 Ohio St.3d 244,

667 N.E.2d 369 (1996) (the prosecutor is entitled to some latitude in closing argument as to what the evidence presented has shown).

*State v. Lynch*, 2018-Ohio-1078, 109 N.E.3d 628, ¶ 36 (8th Dist.).

{¶ 117} In the instant matter, we initially note that unlike the question about appellant's criminal record, defense counsel did not object to the prosecutor's purportedly improper statement about the evidence corroborating itself. Accordingly, appellant has waived the issue on appeal except for plain error. *Pate*, 8th Dist. Cuyahoga No. 95382, 2011-Ohio-1692, at ¶ 21, citing *State v. Owens*, 51 Ohio App.2d 132, 146, 366 N.E.2d 1367 (9th Dist.1975). *Accord State v. Harris*, 2017-Ohio-2751, 90 N.E.3d 342, ¶ 83 (8th Dist.). Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Moreover, "[p]lain error does not exist unless, but for the error, the outcome at trial would have been different." *State v. Joseph*, 73 Ohio St.3d 450, 455, 653 N.E.2d 285 (1995), citing *State v. Moreland*, 50 Ohio St.3d 58, 552 N.E.2d 894 (1990).

{¶ 118} After reviewing the record and the purportedly improper remark about the evidence in context, we cannot say that the prosecutor's comment was improper. As noted above, the state advised the jury during closing arguments that the 1998 incident and 2018 incident were "two separate unrelated instances[.]" (Tr. 1658.) The state went on to advise the jury that the two cases were separate, unrelated, and that they should be considered separately by the jury. (Tr. 1675.)

{¶ 119} Finally, the trial court instructed the jury that closing statements do not constitute evidence and "shall not be considered as evidence by the jury." (Tr. 1582.) This court presumes that the jury followed the trial court's instructions. *Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, at ¶ 157.

{¶ 120} Based on the foregoing analysis, appellant's fifth assignment of error is overruled with respect to the prosecutor's comment about the evidence corroborating itself.

### E. Sexually Violent Predator Specification

{¶ 121} In his sixth assignment of error, appellant challenges his conviction on the sexually violent predator specification underlying the rape offense charged in Count 2 of the 1998 indictment. Specifically, appellant contends that the trial court erred in finding him guilty on the specification because he did not have a prior conviction for a sexually violent offense.

{¶ 122} As an initial matter, we note that appellant did not challenge the validity of the sexually violent predator specification in the trial court. Furthermore, appellant did not raise a constitutional Ex Post Facto Clause argument in the trial court, nor does he raise this argument on appeal. *See State v. Awan*, 22 Ohio St.3d 120, 489 N.E.2d 277 (1986), syllabus ("[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and * * * therefore need not be heard for the first time on appeal."). Nevertheless, based on this court's recent rulings in *State v. Frierson*, 8th Dist. Cuyahoga No. 106841, 2019-Ohio-317, and

*State v. Townsend*, 8th Dist. Cuyahoga No. 107186, 2019-Ohio-1134, we find that appellant's conviction on the sexually violent predator specification constitutes plain error.[7]

{¶ 123} At the time appellant allegedly committed the rape offense charged in Count 2 of the 1998 indictment, R.C. 2971.01(H)(1) defined a "sexually violent predator" as "a person who has been convicted of or pleaded guilty to committing, on or after [January 1, 1997], a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." *See* 1995 Ohio H.B. 180.

> In *State v. Smith*, 104 Ohio St.3d 106, 2004-Ohio-6238, 818 N.E.2d 283, the Ohio Supreme Court held that the conviction of a sexually violent offense cannot support the specification that the offender is a sexually violent predator as defined in R.C. 2971.01(H)(1) if the conduct leading to the conviction and the sexually violent predator specification are charged in the same indictment. In response to the *Smith* case, the General Assembly revised R.C. 2971.01(H)(1) to allow for the inclusion of a sexually violent predator specification in the indictment of one being charged for the first time with a sexually violent offense. *State v. Green*, 8th Dist. Cuyahoga No. 96966, 2012-Ohio-1941, ¶ 25; *see also State v. Stansell*, 2014-Ohio-1633, 10 N.E.3d 795 (8th Dist.). The current version of the statute provides that a "sexually violent predator" is "a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." R.C. 2971.01(H)(1).

*Townsend* at ¶ 62.

{¶ 124} In *Frierson*, the defendant was charged with rape and kidnapping offenses allegedly committed in July 1997, and rape and kidnapping offenses allegedly committed in 2000. *Id.* at ¶ 2. The issue before this court in *Frierson* was

---

[7] The state acknowledges this court's holdings in *Frierson* and *Townsend*, but does not concede the issue. The state is currently pursuing an appeal of the *Frierson* decision. *State v. Frierson*, Ohio Supreme Court No. 2019-0899.

whether the application of R.C. 2971.01(H)(1) to the defendant violated the Ex Post

Facto Clause of the United States Constitution. The *Frierson* court held that the

amended R.C. 2971.01(H)(1), when applied to the defendant in that case did, in fact,

violate the Ex Post Facto Clause of the United States Constitution:

> Retroactive changes in the measure of punishment are impermissibly ex post facto if they subject a defendant to a more severe sentence than was available at the time of the offense. *State v. Furness*, 8th Dist. Cuyahoga No. 99930, 2014-Ohio-414, ¶ 11, citing *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829. The Ex Post Facto Clause found in Section 10, Article I of the United States Constitution, bars "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *State v. White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, ¶ 50, quoting *Calder v. Bull*, 3 U.S. 386, 390, 1 L.Ed. 648, 3 Dall. 386 (1798).
>
> We find the Ex Post Facto Clause to be applicable in this instance. Under the plain language in R.C. 2971.01(H)(1) as it existed at the time of Frierson's offenses, he was not eligible for the enhanced, indefinite sentencing under R.C. 2971.03 because he did not qualify as a sexually violent predator. As the Ohio Supreme Court stated in *Smith*, the words of R.C. 2971.01(H)(1) as it existed during the relevant periods clearly indicated that at the time of indictment, the person must have already been convicted of a sexually violent offense in order to be eligible for the specification. The legislature's subsequent amendment of the statute following *Smith* was not mere "clarification" as the state argues, but a significant and substantive change to the definition of "sexually violent predator," allowing, for the first time, the underlying conduct in an indictment to satisfy the specification without a prior conviction. As applied to Frierson, this amendment greatly enhanced his potential punishment by subjecting him to the indefinite sentencing found in R.C. 2971.03 whereas he was not subject to an enhanced sentence prior to the amendment. Therefore, we find that amended R.C. 2971.01(H)(1), as applied to Frierson, violates the Ex Post Facto Clause of the United States Constitution.

*Frierson* at ¶ 11-12.

{¶ 125} In the instant matter, as noted above, appellant committed the rape

offense alleged in Count 2 of the 1998 incident prior to the amendment of R.C. 2971.01(H)(1) in April 2005. The 2005 amendment greatly enhanced appellant's potential punishment by subjecting him to the indefinite sentencing found in R.C. 2971.03. Prior to the 2005 amendment, appellant would not have been subjected to an enhanced sentence. Accordingly, we find that the 2005 amendment to R.C. 2971.01(H)(1), as applied to appellant, violates the Ex Post Facto Clause of the United States Constitution. Appellant's sixth assignment of error is sustained.

{¶ 126} Appellant's conviction on the sexually violent predator specification on Count 2 of the 1998 indictment is vacated. Appellant's sentence on Count 2 is vacated, and the matter is remanded for the limited purpose of resentencing appellant on Count 2. Our resolution of appellant's sixth assignment of error renders appellant's seventh assignment of error moot.

### F. Postrelease Control

{¶ 127} Finally, we find, sua sponte, that the trial court failed to impose postrelease control on Count 5 of the 2018 case at sentencing. The Ohio Supreme Court has held that a trial court's failure to impose postrelease control results in a void sentence. *State v. Fischer*, 128 Ohio St.3d 92, 2010-Ohio-6238, 942 N.E.2d 332, paragraph one of the syllabus. The court explained that only the improper portion of the sentence, not the entire sentence, is void. *Id.* at ¶ 28. Subsequently, the Ohio Supreme Court reaffirmed that a trial court's failure to impose postrelease control results in a void sanction only. *State v. Holdcroft*, 137 Ohio St.3d 526, 2013-Ohio-5014, 1 N.E.3d 382, paragraph two of the syllabus.

{¶ 128} The trial court may correct the offending portion of appellant's sentence on Count 5, the postrelease control sanction, at any time prior to the expiration of the attendant sentence. *State ex rel. Rodriguez v. Barker*, 8th Dist. Cuyahoga No. 107831, 2019-Ohio-256, ¶ 13, citing *Fischer* and *Holdcroft*. On remand at resentencing, either the state or appellant can petition the court to address this issue and impose postrelease control on Count 5. The trial court can correct the failure to impose postrelease control on Count 5 pursuant to R.C. 2929.191. *See State ex rel. Worley v. Ambrose*, 8th Dist. Cuyahoga No. 106775, 2018-Ohio-1206, ¶ 8 (because defendant is still serving his sentence, the trial court has a duty to impose postrelease control).

### III. Conclusion

{¶ 129} After thoroughly reviewing the record, we overrule appellant's first, second, third, fourth, and fifth assignments of error. The trial court did not err in denying appellant's motion to dismiss based on preindictment delay or granting the state's motion for joinder; appellant's convictions are not against the manifest weight of the evidence; and the state did not commit prosecutorial misconduct during trial nor was appellant denied his right to a fair trial.

{¶ 130} We sustain appellant's sixth assignment of error, rendering the seventh assignment of error moot. Appellant's conviction on the sexually violent predator specification underlying Count 2 of the 1998 indictment is vacated, and appellant's 12-year prison sentence on Count 2 is vacated. The matter is remanded

to the trial court for the limited purpose of resentencing appellant on Count 2 of the 1998 indictment.

{¶ 131} Finally, on remand, the trial court can correct its failure to impose postrelease control on Count 5 of the 2018 indictment.

{¶ 132} Judgment affirmed in part, vacated in part, and remanded for limited resentencing.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., JUDGE

MARY J. BOYLE, P.J., and
ANITA LASTER MAYS, J., CONCUR