[Cite as *State v. Palmer-Tesema*, 2020-Ohio-907.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,            :

                        No. 107972

v.                                          :

YOHANN PALMER-TESEMA,                       :

    Defendant-Appellant.            :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 12, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-626287-A

---

### *Appearances:*

David L. Doughten, *for appellee.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Carl Mazzone and Christopher D. Schroeder, Assistant Prosecuting Attorneys, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Defendant-appellant, Yohann Palmer-Tesema ("Palmer-Tesema"), appeals his convictions after a jury found him guilty of six counts of rape and three counts of kidnapping. Finding no merit to the appeal, we affirm his convictions.

## II.  Procedural History and Factual Background

{¶ 2} In March 2018, Palmer-Tesema was named in a nine-count indictment related to crimes committed against three women — S.L., N.D., and M.C.  Pertaining to S.L., he was charged with two counts of rape (vaginal and anal intercourse) and one count of kidnapping.  As related to N.D., Palmer-Tesema was charged with one count of rape (digital penetration) and one count of kidnapping.  Relating to M.C., he was charged with three counts of rape (digital penetration, vaginal intercourse, and cunnilingus) and one count of kidnapping.  All charges contained a sexually violent predator specification, and the kidnapping charges carried a sexual motivation specification.

{¶ 3} Prior to trial, Palmer-Tesema filed a motion for relief from prejudicial joinder, seeking separate trials for the counts pertaining to each victim.  The state opposed the motion, and following a hearing, the trial court denied Palmer-Tesema's motion to sever.

{¶ 4} The matter was tried before a jury except for the sexual predator specifications, which were tried to the bench.

### A.  The Trial

{¶ 5} Three women, S.L., N.D., and M.C., each were raped by Palmer-Tesema.  Although the rape of each woman was a separate and distinct incident, taken together, they occurred close in time and bear factual similarities.  The rapes occurred between November 22, 2017 and January 14, 2018, and each were

committed at Palmer-Tesema's house, in his bed, and in spite of each victim's substantial impairment and lack of consent.

### 1. S.L. — November 22, 2017

{¶ 6} S.L. testified that on November 22, 2017, the night before Thanksgiving, she went out with her friends to the West End Tavern ("West End") in Lakewood, Ohio. Prior to arriving at the bar, S.L. consumed six beers and shared half of a box of wine. She admitted it was not uncommon for her to consume this much alcohol at least once a week.

{¶ 7} She testified that when she arrived at the West End she was "definitely feeling tipsy" and had "started going in and out." She clarified that she was "on the verge of blacking out," — characterizing it as a "brownout." At the bar, one of her friends bought her a shot. S.L. did not recall if she had other drinks at the bar aside from the shot, but said it was the last thing she remembered that evening.

{¶ 8} In the morning, S.L. woke up, still drunk, and in a house she did not recognize. She was in bed with Palmer-Tesema, whom she recognized from high school but had not seen for a year. According to S.L., they were never friends. She testified that she was confused and naked from the waist down. She noticed that the bed was wet underneath her, which she thought at the time could be urine. Her hearing processor device and cell phone were beside the bed, but she could not locate her purse.[1] She asked Palmer-Tesema if they had sex. He denied it, claiming

---

[1] S.L. testified that she is profoundly deaf and has a cochlear implant. She wears an external audio processor at all times except when she sleeps and showers.

nothing happened. S.L. found her underwear and pants, got dressed, and texted her brother. She stated she was still drunk and everything was blurry.

{¶ 9} S.L.'s brother, D.L., testified that he woke up Thanksgiving morning and saw a text message sent by his mother stating that S.L. had not come home. He also saw two text messages sent at 1:51 a.m. from S.L.'s cell phone that read "[S.L.'s] sleeping at my place this is yohann [sic]," and "I live in bay village [sic]." D.L. responded to the message at 6:59 a.m.: "whew thanks man. she awake now? and okay? [sic]." He testified that he tried to locate Palmer-Tesema's address to find his sister. Around 8:30 a.m. he received a text message from S.L. stating that she was okay; he picked her up shortly thereafter.

{¶ 10} S.L. testified that she went to the bathroom at her brother's house and noticed that her vagina was "very stretched out" and that she felt "very sore all over" her body. (Tr. 416.) She testified that it was painful to urinate. She began crying and immediately told her brother that something happened — "he did something to me."

{¶ 11} D.L. drove S.L. to the NORD Center in Lorain and a sexual examination was performed by Amanda McCall, a sexual assault nurse examiner ("SANE"). S.L. told McCall that Palmer-Tesema raped her the night before. McCall testified that she found bruising to S.L.'s inner thigh and calf. According to McCall, the bruising was consistent with finger marks. McCall also testified that she noted the presence of white discharge in S.L.'s vaginal cavity, which could be consistent with semen. A toxicology screen was also performed and the results

revealed that at 1:30 p.m., which was approximately 12 hours after she stopped drinking, S.L. had a blood-alcohol content of 0.165.

{¶ 12} S.L. testified that later that evening she felt pain in her anus and was unable to have a bowel movement. At that time, she told her parents what happened, and the following morning they took her to Fairview Hospital and then to the Bay Village Police station to report the rape.

{¶ 13} Salesha Baksh ("Baksh"), a forensic DNA analyst with the Cuyahoga County Regional Forensic Science Laboratory, tested swabs taken from S.L.'s rape kit. She testified that Palmer-Tesema's DNA was a match for the DNA found on the swabs taken from inside of the crotch area of S.L.'s underwear.

{¶ 14} The state pieced S.L.'s night together through the West End's surveillance video recordings and the testimonies of (1) a West End bartender, (2) the Uber driver who accepted S.L.'s Uber request, and (3) Palmer-Tesema's roommates and friends.

{¶ 15} The jury watched the surveillance video and saw S.L's interactions at the bar prior to leaving with Palmer-Tesema, including talking to unknown men. The state also presented the testimony of the West End bartender who stopped serving S.L. alcohol due to her intoxicated state. The Uber driver who drove Palmer-Tesema and S.L. to S.L.'s parent's house, then to Palmer-Tesema's house, testified about the couple's interactions during the ride, including that they were kissing. The state also presented testimony from two of Palmer-Tesema's roommates who described S.L. and Palmer-Tesema's behavior after they arrived at

their house.  Finally, Palmer-Tesema's friend testified that Palmer-Tesema "kind of bragged" to her on Thanksgiving night that the night before, "he slept with a girl he didn't want to, but she started taking her clothes off so he had to do it."  (Tr. 594.)

{¶ 16} The jury also heard testimony from the investigating detectives and listened to Palmer-Tesema's initial interview with police denying any sexual conduct with S.L., even though she "wanted to" but he did not because she was way too drunk and he was not attracted to her.  He told them that she slept in his bed, and he slept on the couch.

### 2.  N.D. — November 29, 2017

{¶ 17} N.D. testified that she met Palmer-Tesema through their mutual friend, M.C. (the third victim).  N.D. explained that she "tolerated" Palmer-Tesema, considering him to be more of an acquaintance.  She was better friends with other members of the group and stated she would hang out with Palmer-Tesema only if he was with other friends.  According to N.D. "[w]e were all friends," who hung out at Palmer-Tesema's house in Bay Village and referred to it as the "Bay house."  She told the jury that they all just slept in the beds that were open or on couches or the floor and were able to leave the next day without having to drive.  N.D. estimated that she had slept in Palmer-Tesema's bed around three to five times, but that he was never in the bed with her.

{¶ 18} On November 29, 2017, N.D. and her friend Tia McCord drank at the Bay house for several hours prior to going to bars, including the West End.  She

remembered having five to seven mixed drinks and three to four shots. She testified that she did not remember leaving the West End. She recalled being back at the Bay house and being "very drunk" before going to sleep in Palmer-Tesema's bed, alone, and fully clothed. N.D. testified that she awoke lying flat on her stomach and to somebody vaginally penetrating her from behind; she eventually realized it was Palmer-Tesema. She did not recall saying or doing anything in response. N.D. was awakened when McCord came into the bedroom the next morning and she realized she was naked from the waist down. N.D. got dressed and left with her friend.

{¶ 19} N.D. told the jury that she did not initially go to the police or report the sexual assault because it was "not registering" to her as a sexual assault. However, after speaking with the Bay Village Police about Palmer-Tesema sexually assaulting M.C., she decided to come forward. She testified that she never consented to have sex with Palmer-Tesema.

### 3. M.C. — January 14, 2018

{¶ 20} M.C. testified that at one point in time she was "very close" friends with Palmer-Tesema and one of his roommates. She would "hang out" at the Bay house three times a week. M.C. explained that she and others in the group, including N.D., would drink excessively and then sleep at the Bay house. M.C. testified that she would "just typically crash on the couch."

{¶ 21} M.C. told the jury that in the summer of 2017, Palmer-Tesema wanted to be more than friends but she did not. She stated that on two prior

occasions, Palmer-Tesema kissed her without her permission but he was respectful when she told him to stop each time.

{¶ 22} M.C. testified that on January 14, 2018, she had been "day drinking." She explained that she had her first drink around 11:30 a.m., and continuously drank for the entire day. This included an unknown number of drinks at the West End Tavern. M.C. explained "I don't remember because I was drunk. I remember where I was and who I was with but at that point I don't really remember the context of conversation or how many drinks I had had." That night, M.C. exchanged text messages with Palmer-Tesema and decided to stay the night at the Bay house.

{¶ 23} She remembered talking to Palmer-Tesema in the kitchen and then waking up with her face in the toilet, unsure if she had vomited. She recalled crawling up the stairs and going directly to Palmer-Tesema's bed. She testified that she fell asleep fully-clothed, and that her next memory was waking up and realizing that Palmer-Tesema's fingers were inside her vagina. She also stated that Palmer-Tesema was having sex with her despite her telling him multiple times to stop. She testified that she was still drunk at that point and was unsure whether she lost consciousness during the sexual encounter. M.C. next recalled waking up naked from the waist down and that Palmer-Tesema's hand was inside her bra. She found her clothes, got dressed, and left.

{¶ 24} The jury read text messages between her and Tia McCord, in which M.C. stated that Palmer-Tesema "borderline raped me." M.C. did not report the

rape to police until another one of her friends, Leah, encouraged her to do so on January 18, 2018.  Following the report and advice of the investigating detective, M.C. went to NORD for a rape-kit examination.

{¶ 25} SANE Nurse Denise Miller, testified that she performed M.C.'s rape-kit examination and observed bruising to M.C.'s abdomen, hips, and buttocks.  A speculum and a toluidine blue dye exam were conducted, revealing a small laceration to the vulva.  According to Miller, the laceration is consistent with vaginal penetration but it does not reveal whether consensual or nonconsensual activity occurred.

{¶ 26} Forensic analyst and expert Baksh also testified that she performed and analyzed the DNA from M.C.'s rape kit.  According to Baksh, a swab taken from the inside crotch area of M.C.'s underwear revealed a mixture of DNA.  Accordingly, additional Y-STR testing, which focuses solely on the Y-chromosome to isolate male DNA in the sample, was performed on the swab.  Christine Scott, a forensic DNA analysis with the Cuyahoga County Regional Forensic Science Laboratory, performed the additional testing and testified that she found that the major Y-STR DNA component in the sample was Palmer-Tesema's.

### 4.  The Defense's Case

{¶ 27} Palmer-Tesema testified.  He admitted that alcohol was involved and that each woman slept in his bed.  He further claimed that he participated in consensual sexual conduct with M.C. and N.D., but denied that any sexual activity occurred with S.L.

**{¶ 28}** In his defense, two of his friends testified regarding the interactions between Palmer-Tesema and S.L. and M.C. His friend Reynaldo testified that he was at the West End on November 22, 2017, and saw S.L and Palmer-Tesema together, and that S.L. was kissing Palmer-Tesema's neck.

**{¶ 29}** On January 14, 2018, Reynaldo was at the Bay house playing cards when M.C. came over. According to Reynaldo, M.C. and Palmer-Tesema were in the kitchen talking, and M.C. was sitting on the kitchen counter with her legs around Palmer-Tesema. He stated that when he and his friends came back from getting pizza, he did not see them again.

**{¶ 30}** Palmer-Tesema's friend Tyler testified that on November 30, 2017, he was with N.D., McCord, and Palmer-Tesema and they were all drinking. According to Tyler, he was initially sleeping in the same bed with Palmer-Tesema but he left when McCord and N.D. came into the room, and N.D. got into the bed with Palmer-Tesema. He testified that he also witnessed M.C. being affectionate toward Palmer-Tesema on January 14, 2018.

## B. The Verdict and Sentence

{¶ 31} The jury found Palmer-Tesema guilty of all charges, including the sexual motivation specifications. Following the jury verdict and prior to sentencing, the state dismissed the sexually violent predator specifications. After merging allied offenses, the trial court imposed an aggregate prison term of 17 years.

{¶ 32} Palmer-Tesema now appeals, raising three assignments of error.

## II. Law and Analysis

### A. Joinder of Offenses

{¶ 33} Prior to trial, Palmer-Tesema filed a motion for relief from prejudicial joinder, seeking separate trials for the counts pertaining to each woman because the underlying facts of each incident were such that presenting them together would confuse the jury and deny him a fair trial. Specifically, he contended that based on the nature of the offenses charged and the similarity of the factual scenarios underlying them, the jury would be influenced by any evidence of guilt as related to one victim and thereby use it to improperly infer guilt as related to another.

{¶ 34} The state opposed the motion, arguing that the joinder of offenses was proper because the evidence was simple and direct pertaining to each victim, the occurrences shared a common modus operandi, and the evidence of each sexual assault would likely be admissible under Evid.R. 404(B). Following a hearing, the trial court denied Palmer-Tesema's motion.

{¶ 35} On at least two different occasions during trial, Palmer-Tesema either renewed his motion for relief from prejudicial joinder or moved for a mistrial on the grounds of prejudicial joinder. The trial court denied each request.

{¶ 36} In his first assignment of error, Palmer-Tesema contends that the trial court abused its discretion when it denied his motion for relief from prejudicial joinder.

{¶ 37} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Ohio law favors joinder of offenses that meet the Crim.R. 8(A) requirements in a single trial. *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 59. "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58, 600 N.E.2d 661 (1992); *see also State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 10 (joinder preferable where not unduly prejudicial).

{¶ 38} In this case, Palmer-Tesema does not dispute that joinder was proper under Crim.R. 8(A); rather, he contends that joinder was unduly prejudicial.

{¶ 39} Crim.R. 14 provides relief from prejudicial joinder. "If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * the court shall order an election or separate trial of counts * * * or provide such other relief as justice

requires." Crim.R. 14. "Severance may be warranted if the trial court finds a serious risk that a joint trial would prevent the jury from making a reliable judgment about guilt or innocence." *State v. Jackson*, 8th Dist. Cuyahoga No. 102394, 2015-Ohio-4274, ¶ 12, citing *United States v. Zafiro*, 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). A defendant seeking severance must provide the trial court "'sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.'" *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 166, quoting *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981). The defendant "'bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance.'" *Dean* at ¶ 60, quoting *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29.

{¶ 40} If a defendant makes a claim for prejudicial joinder, "[t]he state may rebut a defendant's claim * * * in two ways." *Dean* at ¶ 61. First, if the state shows that the evidence of each joined offense is "simple and direct" the defendant's claim of prejudice fails. *Id.* Where the evidence of the joined offenses is "uncomplicated," such that the jury is "capable of segregating the proof" required to prove each offense, a defendant is not prejudiced by the joinder. *State v. Lunder*, 8th Dist. Cuyahoga No. 101223, 2014-Ohio-5341, ¶ 33.

{¶ 41} The second way the state can refute prejudice is if the state could otherwise introduce evidence of the joined offenses at separate trials as "other acts" pursuant to Evid.R. 404(B). *Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d

80, at ¶ 61.  However, if the state can establish that the evidence of each offense is simple and direct, it need not establish that the evidence would be otherwise admissible under Evid.R. 404(B).  *State v. Clipps*, 8th Dist. Cuyahoga No. 107747, 2019-Ohio-3569, ¶ 45.

{¶ 42} Evidence is "simple and direct" if (1) the jury is capable of readily separating the proof required for each offense, (2) the evidence is unlikely to confuse jurors, (3) the evidence is straightforward, and (4) there is little danger that the jury would "improperly consider testimony on one offense as corroborative of the other." *State v. Wright*, 4th Dist. Jackson No. 16CA3, 2017-Ohio-8702, ¶ 52.  Courts have held that evidence of multiple offenses is "simple and direct" where, for example, the offenses involved different victims, different incidents or factual scenarios, and different witnesses.  *State v. Dantzler*, 10th Dist. Franklin Nos. 14AP-907 and 14AP-908, 2015-Ohio-3641, ¶ 23.  Thus, as this court has stated, "Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof."  *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 16, citing *State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224 and L-09-1225, 2010-Ohio-4202, ¶ 33.

{¶ 43} In this case, Palmer-Tesema offers no evidence or support for his claim that he was prejudiced by the jury's consideration of the joined offenses.  Instead, and without identifying any purportedly confusing evidence or demonstrating how the jury was confused, he generally argues that the evidence was

"confusing," and the witnesses were "mixed" and "intertwined." Palmer-Tesema's bare allegations are insufficient to establish prejudice. *See, e.g., State v. Rosas*, 2d Dist. Montgomery No. 22424, 2009-Ohio-1404, ¶ 48 (defendant "merely assert[ed] broad general allegations of prejudice that any defendant could assert"); *State v. Corker*, 10th Dist. Franklin Nos. 13AP-264, 13AP-265, 13AP-266, 2013-Ohio-5446, ¶ 21, quoting *State v. Strobel*, 51 Ohio App.3d 31, 32, 554 N.E.2d 916 (3d Dist.1988) (rejecting defendant's "bare assertions" of prejudice and noting always the possibility of prejudice in joining separate instances of any offense in the same indictment, but that the defendant bears the burden to "'either affirmatively demonstrate before trial that his rights would be prejudiced by the joinder, or to show at the close of the state's case, or at the conclusion of all the evidence, that his rights actually had been prejudiced by the joinder'").

{¶ 44} The record before us does not reflect that prejudicial joinder occurred because the state presented simple and direct testimony relating to each of the three different victims. Each victim provided detailed testimony of the separate incidents, and the record reflects that the evidence pertaining to each victim in each offense is separate and distinct and could easily be segregated. Although the rapes may have occurred around the same approximate time, the state presented each witness's testimony separately so that there was no danger of confusing the evidence.

{¶ 45} The first nine witnesses presented to the jury testified regarding the events leading up to and the rape of S.L., including S.L.'s own testimony.

{¶ 46} Thereafter, the state called a forensic DNA analyst who testified that she analyzed evidence from both S.L.'s and M.C.'s rape kits. After a general introduction regarding the procedure for performing such an analysis, the analyst testified about specific aspects of S.L.'s rape kit, and the specific findings and conclusions relating solely to S.L. Following a recess "to clear our heads," the analyst then testified about the analysis, findings, and conclusions of M.C.'s rape kit, including that more specific testing was conducted.

{¶ 47} The next witness the state called was a toxicologist to discuss S.L.'s toxicology report revealing her level of intoxication the morning after the rape. Only S.L. submitted to a toxicology screen; thus the jury would not have been confused or unable to separate the findings. A second forensic DNA analyst testified next regarding the specific testing and analysis conducted on the foreign DNA discovered from M.C.'s rape kit.

{¶ 48} Thereafter, the state called three witnesses pertaining solely to the rape of M.C., including M.C. Following these witnesses, N.D. testified and a mutual friend of both M.C. and N.D. testified about her interactions with both victims.

{¶ 49} The final witness was the investigative detective whose testimony was direct and gave a detailed timeline and sequence of events from the beginning of his assignment of the case involving S.L., the investigative process, and the discovery of the incident involving M.C., which then lead to the discovery of the rape of N.D.

{¶ 50} Based on the foregoing, we find that the testimony and evidence was clearly distinguishable, easily separated, and not confusing.

{¶ 51} Furthermore, the state presented more than sufficient evidence with respect to each victim so that there is no danger that the jury convicted Palmer-Tesema based on an accumulation of evidence. *See State v. Jamison*, 49 Ohio St.3d 182, 187, 552 N.E.2d 180 (1991) (concluding that joined offenses are not prejudicial when evidence presented was "amply sufficient to sustain each verdict, whether or not the indictments were tried together" and the strength of the state's proof establishes that the prosecution did not attempt to prove one case simply by questionable evidence of the other offenses). In fact, Palmer-Tesema makes no argument on appeal that the evidence was insufficient to support any of the offenses charged. *See State v. Roberts*, 62 Ohio St.2d 170, 405 N.E.2d 247 (1980) (prejudice may be demonstrated when the evidence, considered separately, would be insufficient to sustain all convictions).

{¶ 52} Moreover, the fact that the jury found Palmer-Tesema guilty of all counts does not support that the jury was confused or conflated the evidence. A trier of fact is considered "capable of segregating the proof of multiple charges when the evidence as to each of the charges is uncomplicated." *State v. Lunder*, 8th Dist. Cuyahoga No. 1011223, 2014-Ohio-5341, ¶ 33, citing *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288.

{¶ 53} Here, the testimony pertaining to each victim was not so complicated that it would potentially confuse the jury. These were not complicated events, and did not depend on complex circumstantial evidence. Two of the victims were able to recall the nonconsensual sexual conduct perpetrated by Palmer-Tesema. And

although S.L. was unable to recall the sexual assault, DNA evidence substantiated her belief that Palmer-Tesema unlawfully engaged in sexual conduct with her.

{¶ 54} Finally, the jury was instructed to consider each count separately, and we presume that the jury followed the court's instructions. *See State v. Gibson*, 6th Dist. Lucas Nos. 2-13-1222 and 2-13-2223, 2015-Ohio-1679, ¶ 30 ("Absent evidence to the contrary, we indulge the presumption that the jury followed the instruction of the trial court."). In this case, the trial court instructed the jury as follows:

> The charges set forth in each count in the indictment constitute a separate and distinct matter. You must consider each count and the evidence applicable to each count separately and you must state your findings as to each count uninfluenced by your verdict as to any other count.

> The defendant may be found guilty or not guilty of any one or all of the offenses charged.

(Tr. 1222-1223.) We note that the jury did not submit any questions during deliberations, and nothing in the record reveals that the jury failed to follow the trial court's instructions.

{¶ 55} Accordingly, because joinder was proper and the evidence was simple and direct, Palmer-Tesema was not prejudiced by joinder, and the trial court did not abuse its discretion in denying the motion to sever. The first assignment of error is overruled.

## II. Sleep Jury Instruction

{¶ 56} In his second assignment of error, Palmer-Tesema contends that the trial court erred by providing the jury with a "sleep" instruction pertaining to the offense of rape.

{¶ 57} In this case, Palmer-Tesema was charged with rape, in violation R.C. 2907.02(A)(1)(c), which provides, in pertinent part,

> [n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

{¶ 58} The state requested that the trial court instruct the jury that "sleep" can constitute "substantial impairment." Over objection, the trial court gave the following jury instruction to the jury on "substantial impairment":

> Substantially impaired means a present reduction, diminution or decrease in the victim's ability either to apprise the nature of his conduct or to control his conduct. Voluntary intoxication is a mental or physical condition that could cause substantial impairment.
>
> Sleep is a mental or physical condition which is sufficient to substantially impair a victim's ability to consent or resist to sexual conduct or contact.

(Tr. 1214.)

{¶ 59} On appeal, Palmer-Tesema contends that the evidence and trial testimony do not support the "sleep" instruction. He maintains that based on the evidence presented and the state's theory of the case — that intoxication was the basis for the victims' impairment — a sleep instruction was improper.

{¶ 60} This court has held that sleep constitutes a mental or physical condition that substantially impairs a person from resisting or consenting to sexual conduct. *State v. Keller*, 8th Dist. Cuyahoga No. 106196, 2018-Ohio-4107, ¶ 25; *State v. McCall*, 8th Dist. Cuyahoga No. 104479, 2017-Ohio-296, ¶ 6, citing *State v.*

*Jones*, 8th Dist. Cuyahoga No. 98151, 2012-Ohio-5737, ¶ 30, citing *State v. Clark*, 8th Dist. Cuyahoga No. 90148, 2008-Ohio-3358, ¶ 21 (when a person is asleep, he or she is not in a mental condition to resist or consent to the sexual conduct).

{¶ 61} The giving of jury instructions is within the sound discretion of the trial court, and is reviewed for an abuse of discretion. *State v. Howard*, 8th Dist. Cuyahoga No. 100094, 2014-Ohio-2176, ¶ 35, citing *State v. Martens*, 90 Ohio App.3d 338, 629 N.E.2d 462 (3d Dist.1993). Trial courts have a responsibility to give all jury instructions that are relevant and necessary for the jury to properly weigh the evidence and perform its duty as the factfinder. *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus.

> A trial court need not instruct the jury where there is insufficient evidence to support an issue. In reviewing a record to ascertain whether sufficient evidence exists to support the giving of an instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.

*Goldfuss v. Davidson*, 79 Ohio St.3d 116, 124, 679 N.E.2d 1099 (1997).

{¶ 62} A review of the record demonstrates that a sleep instruction was proper because sufficient evidence was presented to support the instruction. Each of the three victims testified that they were either intoxicated or asleep on the nights of the rape. Unlike the circumstances surrounding the rape of S.L., who could not recall any events beyond being at the West End Tavern, both M.C. and N.D. testified that they were awakened by Palmer-Tesema engaging in sexual conduct with them

without their consent. Accordingly, the evidence supported a sleep instruction regarding at least two of the victims.[2]

**{¶ 63}** Moreover, Palmer-Tesema testified that M.C. was not intoxicated that night; rather, he stated that "she was falling asleep as in she was sleepy." (Tr. 1183.) Accordingly, by Palmer-Tesema's own testimony and M.C.'s testimony that she was awakened by Palmer-Tesema raping her, the sleep jury instruction was proper because sufficient evidence was presented supporting the instruction.

**{¶ 64}** Additionally, Palmer-Tesema testified that although he was drunk, he did not believe that N.D. was intoxicated the night he engaged in sexual conduct with her. (Tr. 1149.) He testified that during sex with N.D., he became sick and vomited as he walked to the bathroom, where he took a shower. Palmer-Tesema stated that after he showered, he went back to his bedroom and continued to have sex with N.D. (Tr. 1154.) He stated, however, that he "believed" that she was awake — "It was very staticky [sic]." (Tr. 1189.) Accordingly, by Palmer-Tesema's own testimony and N.D.'s testimony that she was awakened by Palmer-Tesema raping her, the sleep jury instruction was proper because sufficient evidence was presented supporting the instruction.

**{¶ 65}** We find that the evidence supported both a voluntary intoxication and sleep instruction. The jury was able to consider the circumstances surrounding each

---

[2] Palmer-Tesema did not request that the court only give the sleep instruction regarding certain victims. On the other hand, when the defense requested and received a lesser-included sexual-battery instruction, the state requested that the instruction only be given regarding the offenses pertaining to N.D. and M.C., and not S.L.

rape, including whether each victim was unable to resist or consent because of substantial impairment by virtue of voluntary intoxication or being asleep.

{¶ 66} Accordingly, the trial court did not abuse its discretion by giving the jury a sleep instruction. Palmer-Tesema's second assignment of error is overruled.

## C. Mid-trial Amendment of the Indictment

{¶ 67} Count 4 charged Palmer-Tesema with the rape of N.D., and alleged that Palmer-Tesema "did engage in sexual conduct to wit: digital penetration of the victim's vagina." During her testimony, N.D. stated that Palmer-Tesema vaginally penetrated her with "[h]is penis." (Tr. 915.) Following N.D.'s testimony, the state moved to amend the offense of rape as charged in Count 4 of the indictment by changing the method of rape from digital penetration to vaginal intercourse. The trial court granted the state's request over objection.

{¶ 68} Palmer-Tesema contends in his third assignment of error that the trial court erred in permitting the state to amend the indictment on a material element of the offense during the trial.

{¶ 69} Crim.R. 7(D) provides that a court may amend an indictment "at any time before, during, or after a trial * * * provided no change is made in the name or identity of the crime charged." "A change in the name or identity of a crime charged occurs when the offense alleged in the indictment and the offense alleged in the amended indictment contain different elements that require independent proof." *State v. Buchanan*, 8th Dist. Cuyahoga No. 104500, 2017-Ohio-1361, ¶ 22. Where the amendment does not change the name or identity of the offense, a reviewing

court will not disturb the trial court's decision to permit the amendment absent an abuse of discretion and a showing of prejudice. *Id.*

**{¶ 70}** Here, the amendment did not change the name or identity of the offense. "Amending a rape charge from one type of sexual conduct to another type of sexual conduct changes neither the name nor the identity of the rape offense." *State v. Abdullah*, 10th Dist. Franklin No. 05AP-1316, 2006-Ohio-5412, ¶ 24, citing *State v. Martin*, 10th Dist. Franklin No. 05AP-818, 2006-Ohio-2749, ¶ 9.

**{¶ 71}** Rape in violation of R.C. 2907.02(A)(1)(c) requires proof that the defendant "engage[d] in sexual conduct with another." R.C. 2907.01(A) defines "sexual conduct" to include both "vaginal intercourse" and digital penetration ("the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another"). As a result, the type of sexual conduct was not an element of the offense, and the state's amendment to the specific type of sexual conduct did not contain any different elements that required independent proof. *See State v. Steele*, 8th Dist. Cuyahoga No. 101139, 2014-Ohio-5431 (amendment proper when it only changed the type of sexual conduct for the rape offense).

**{¶ 72}** Palmer-Tesema relies upon this Court's decision in *State v. Vitale*, 96 Ohio App.2d 695, 645 N.E.2d 1277 (8th Dist.1994), where this court held that the amendment to the indictment was prejudicial to Vitale's defense because it included a different potential theft, occurring at a different address, over an expanded time

period. This amendment was different from the evidence on which the grand jury issued the indictment.

{¶ 73} *Vitale* is distinguishable because the amendment to Count 4 did not allow the state to argue a different rape, at a different address, at a different date. Nor did it allow the jury to find Palmer-Tesema guilty of a different offense than indicted. The amendment merely changed the type of sexual conduct to correct "any variance with the evidence[.]" Crim.R. 7(D).

{¶ 74} Finally, the amendment did not prejudice Palmer-Tesema because his defense did not depend on a distinction between vaginal intercourse and digital penetration. Palmer-Tesema's defense as to N.D. was that the sex was consensual. (Tr. 1267; 1278.) Neither N.D. nor any other witness testified that N.D. consented to one type of sexual conduct versus another. To the contrary, N.D. testified that she never consented to any type of sexual conduct with Palmer-Tesema. Accordingly, he was not prejudiced, and the trial court did not abuse its discretion in allowing the state to amend the indictment to conform to the evidence.

{¶ 75} Palmer-Tesema's third assignment of error is overruled.

{¶ 76} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's

convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

FRANK D. CELEBREZZE, P.J., CONCURS;
EILEEN A. GALLAGHER, J., DISSENTS WITH SEPARATE OPINION

EILEEN A. GALLAGHER, J., DISSENTING:

{¶ 77} I respectfully dissent from my learned colleagues' resolution of the first assignment of error. I believe that Palmer-Tesema did establish that he was prejudiced by the joinder of offenses and that the trial court abused its discretion by denying severance. *See State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, ¶ 60.

{¶ 78} Before trial, Palmer-Tesema filed a motion for relief from prejudicial joinder seeking separate trials for counts as pertaining to each woman. He argued that the underlying facts of each incident were such that presenting them together would confuse the jury and deny him a fair trial. He argued that there was a "particularly strong" likelihood that the jury would be influenced by any evidence of guilt as related to one woman and thereby use it to improperly infer guilt as related to another. I think that is precisely what happened.

{¶ 79} At the hearing on his motion, Palmer-Tesema argued that based on the nature of the offenses charged and the similarity of the factual scenarios underlying them, the jury would be unable to consider the evidence relating to one of the women solely for the charges pertaining to her and that the jury would use evidence pertaining to one woman as proof establishing the claims of another.

{¶ 80} During trial he reasserted this argument and made specific reference to the victims' testimony. He complained that the victims impermissibly "bootstrapped each other's credibility."

{¶ 81} I think Palmer-Tesema met his requisite burden of "furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial." *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981).

{¶ 82} Moreover, I think the state failed to meet its reciprocal burden and rebut Palmer-Tesema's claim. The state could have rebutted Palmer-Tesema's prejudice claim by showing the evidence of each joined offense was "simple and direct" or that it could otherwise introduce the evidence at separate trials pursuant to Evid.R. 404(B). *State v. Dean*, 146 Ohio St.3d 106, 2015-Ohio-4347, 54 N.E.3d 80, at ¶ 61. I don't think the state did either.

**Simple and Direct Evidence**

{¶ 83} I recognize that this court has observed that appellate courts "'routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses * * * without significant overlap or conflation of

proof.'" *State v. Knox*, 8th Dist. Cuyahoga No. 107414, 2019-Ohio-1246, ¶ 49, quoting *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, ¶ 16. The majority found the testimony and evidence to be "clearly distinguishable, easily separated, and not confusing." I find that the record belies this claim and respectfully disagree with the majority opinion.

{¶ 84} As the majority observed, the events in this case occurred close in time and involved similar factual backgrounds. They involved the same people and locations. The state further admitted, the witnesses were "inextricably intertwined." It observed that the three women "at the very base are acquainted with each other and at most are friends," that "[a]ll of the witnesses here know each other." And it recognized that "[e]veryone here is, at the very baseline, acquaintances running up the gamut to good and very close friends."

{¶ 85} Although I quibble with the state's absolute characterizations of the witnesses and evidence, [3] I think its basic sentiment about the interconnectedness of the witnesses and evidence is correct. Indeed, this highlights precisely why the evidence was not simple and direct. I disagree with the majority's characterization that the evidence as presented was "separate and distinct and could easily be segregated."

---

[3] For example, one of the testifying witnesses, a driver for the ride-sharing service Uber, who testified solely to her experience driving Palmer-Tesema and S.L. to Palmer-Tesema's house. There was no evidence that the driver knew any of the other witnesses. Moreover, one of Palmer-Tesema's roommates testified that although he was acquainted with many of the other witnesses, he did not know N.D. Similarly, a different witness who was similarly acquainted testified that she did not know S.L.

{¶ 86} The state questioned witnesses about multiple incidents at the same time. For example, the state questioned one roommate about the alleged incident with S.L., followed by questions about the alleged incident with M.C. before proceeding to inquire again about the alleged incident with S.L. Whether intentional or not, this invited the jury to conflate facts about each incident.

{¶ 87} Similarly, a forensic DNA analyst testified as to her analysis of both S.L.'s and M.C.'s rape kits at the same time. After a general introduction regarding the general procedure for performing such an analysis, the analyst testified about specific aspects of S.L.'s rape kit and specific findings and conclusions related to it. As the majority points out, after this testimony the court ordered a "quick ten-minute break just to clear our heads" before the state proceeded to question the analyst about M.C.'s rape kit. However, in the midst of its questions about M.C.'s rape kit, the state again addressed S.L.'s rape kit:

> And, once again, this testing that was done on the items submitted for [M.C.], is this happening in similar time as the items submitted in testing for [S.L.]? If you can go back to State's Exhibit 120 [S.L.'s DNA analysis].

(Tr. 695.)

{¶ 88} The state then questioned the analyst about S.L. again, this time with regard to a second DNA analysis performed on her rape kit. The state inquired further about M.C.'s rape kit and a second DNA analysis performed on it. The state then questioned the analyst about the formal reports generated on each of the four analyses, two relating to S.L.'s rape kit and two relating to M.C.'s rape kit and further

inquired about comparisons of the reports. The state then discussed S.L.'s rape kit again, this time relating to a third DNA analysis.

{¶ 89} The next witness that the state called was a toxicologist to discuss S.L.'s toxicology report that indicated her level of intoxication following the evening she spent with Palmer-Tesema. The state then called a second DNA analyst to discuss a third DNA analysis performed on M.C.'s rape kit. Again, whether intentional or not, jumping back and forth between specific facts relating to different incidents invited the jury to confuse and conflate the evidence.

{¶ 90} The investigating detective's testimony further illustrated the interrelatedness of the incidents and the evidence and the overlap of the investigations. Investigation into S.L.'s claims began with her November 22, 2017 interview. The detective detailed that S.L.'s investigation involved inquiry into the West End Tavern, including attempts to interview staff and management and locate surveillance footage. He discussed how that investigation also included interviews with Palmer-Tesema and some "Bay House" roommates and that this investigation continued into February 2018.

{¶ 91} The detective also discussed investigating M.C.'s claims following her January 17, 2018 police report. This investigation involved interviewing M.C. as well as several of her friends. The detective discussed these interviews in the context of M.C.'s claims but also described how these interviews involved N.D.'s claims as well.

{¶ 92} Although police investigation into N.D.'s claims began during the pendency of both the S.L. and M.C. investigations, the detective testified N.D.

alleged Palmer-Tesema sexually assaulted her on November 30, 2017, the same day that police interviewed Palmer-Tesema pursuant to their S.L. investigation, before the date which M.C. claimed Palmer-Tesema assaulted her.

{¶ 93} The detective further testified about the factual similarities between the three claims:

> The similarities were the alcohol, similarities in which the individuals involved indicated how they woke up in the morning. So those — the fact that there was some level of either being in the same social group or at least a level of acquaintance, that the circumstances were similar enough * * *.

{¶ 94} Based on the interrelationship of the evidence presented at trial, including the overlapping relationships between both victims and witnesses, the similarities between the between underlying facts of the crimes as alleged and the timeline in which they were claimed to have occurred, I believe that the evidence was not simple and direct such that the jury would confuse and conflate the evidence. In fact, it appears that is precisely what happened here. The jury convicted Palmer-Tesema on every count. *Compare State v. Powell*, 8th Dist. Cuyahoga No. 107276, 2019-Ohio-4345, ¶ 78 (conviction on some counts and acquittal on other "reflects the jury's ability to segregate the proof"); *compare State v. Lee*, 8th Dist. Cuyahoga No. 104682, 2017-Ohio-1449, ¶ 19 (jury acquittal as to some offenses reflects "simple and direct" evidence); *compare State v. Bonneau*, 8th Dist. Cuyahoga No. 97565, 2012-Ohio-3258, ¶ 22 (not guilty verdict as counts pertaining to one victim and guilty verdicts as to another demonstrated jury was able to separate the evidence and consider victims separately).

**{¶ 95}** Put differently, I think the state failed to rebut Palmer-Tesema's prejudicial joinder claim by failing to establish that the evidence was simple and direct. *See Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138 at ¶ 16, quoting *State v. Echols*, 128 Ohio App.3d 677, 694, 716 N.E.2d 728 (1st Dist. 1998). ("'The object of the simple and distinct test is to prevent the jury from improperly considering evidence of various crimes as corroborative of each other. The very essence of the rule is that the evidence be such that the jury is unlikely to be confused by it or misuse it.'").

**Evid.R. 404(B)**

**{¶ 96}** The state also failed to demonstrate that the evidence was otherwise admissible pursuant to Evid.R. 404(B). The state's Evid.R. 404(B) argument as to why the joinder was not prejudicial that the evidence demonstrated "the modus operandi as well as identification."

**Identity and Modus Operandi**

{¶ 97} The Supreme Court has recognized that in the context of Evid.R. 404(B), other acts evidence can be used to prove identity in two situations. In the first, the state may use other acts to prove identity "where other acts 'form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment,' and which are 'inextricably related to the alleged criminal act.'" *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994), quoting *State v. Curry*, 43 Ohio St.2d 66, 73, 330 N.E.2d 720 (1975). The first situation does not apply in this case. The evidence related to one woman's claims does not form the background or foundation of the incidents involving the other women's claims. Moreover, despite having occurred in close temporal proximity and with similar factual backdrops, each incident was clearly separate from the others; the state showed no inextricable relationship uniting them.

{¶ 98} The second situation that the Supreme Court has recognized where other acts evidence can be used to prove identity is when the other acts establish a "modus operandi applicable to the crime with which a defendant is charged * * * 'forming a unique, identifiable plan of criminal activity * * *.'" (Emphasis deleted.) *Id.,* quoting *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (1990), syllabus. In discussing Evid.R. 404(B) evidence in the context of modus operandi, the Supreme Court has further explained that such evidence is admissible

> [N]ot because it labels a defendant as a criminal, but because it
> provides a behavioral fingerprint which, when compared to the

behavioral fingerprints associated with the crime in question, can be used to identify the defendant as the perpetrator.

*Lowe* at 531.

{¶ 99} I acknowledge that there are indeed factual similarities between each incident as alleged by the women, however I think those similarities are decidedly insufficient to establish a behavioral fingerprint. *See State v. Picklesimer*, 4th Dist. Pickaway No. 96CA2, 1996 Ohio App. LEXIS 4668, at *10 (Oct. 15, 1996) ("In order to be admissible for identity purposes, the similarity between the other acts and the charged offense, i.e., their pattern and characteristics, must be so unusual and distinctive as to be like a signature."); *see State v. Miller*, 4th Dist. Washington No. 06CA57, 2007-Ohio-6909, ¶ 28 ("The mere repeated commission of crimes of the same class is insufficient to establish a behavioral fingerprint.").

{¶ 100} I reject the state's argument that the evidence of each incident would be otherwise admissible to prove identity and modus operandi. *See also State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992) ("[The danger that a jury will convict a defendant solely based on the assumption that he has a propensity to commit criminal acts or deserves punishment regardless of guilt] is particularly high when the other acts are very similar to the charged offense, or of an inflammatory nature * * *."). As such, the state failed to rebut Palmer-Tesema's prejudicial joinder claim by establishing that the evidence was otherwise admissible pursuant to Evid.R. 404(B).

**Conclusion**

{¶ 101} The evidence in this case as related for each alleged incident was far from overwhelming. For example, the Uber driver who transported Palmer-Tesema and S.L. from the bar to Palmer-Tesema's house testified that although S.L. was "clumsy" getting into the car, by the time they arrived she "got out by herself and walked up to the door by herself" and that "[i]t was just a straight walk." The majority notes that S.L.'s toxicology report indicated that the next day S.L. still had a substantial amount of alcohol in her system. But S.L. admitted in her testimony that she was a frequent, heavy drinker. This evidence raises questions as to whether Palmer-Tesema knew or had reasonable cause to believe that S.L. was substantially impaired.

{¶ 102} Similarly, as the majority notes, N.D. testified that she did not initially go to the police or seek medical attention because she "wasn't registering" the incident as a sexual assault at that time. It was only after learning of M.C.'s claim that she came forward with her own.

{¶ 103} I believe that the trial court abused its discretion by denying severance.

{¶ 104} The majority notwithstanding, this court has previously recognized the "'spill-over effect'" where a jury "'relies on evidence present on one set of counts when reaching a conclusion on the other set.'" *State v. Jackson*, 8th Dist. Cuyahoga No. 102394, 2015-Ohio-4274, ¶ 12, quoting *United States v. Ervin*, 540 F.3d 623,

628 (7th Cir.2008). Unfortunately for Palmer-Tesema, I think that is exactly what happened here.

{¶ 105} Accordingly, I would vacate Palmer-Tesema's convictions and remand the case for separate trials.